Maura Walsh Ochoa (SBN 193799)
Grotefeld Hoffmann LLP
700 Larkspur Landing Cir., Ste 280
Larkspur, CA 94939
Telephone: 415.344.9670
Facsimile:  415.989.2802

Marc Polansky (SBN 236176)
Grotefeld Hoffmann LLP
5535 Balboa Blvd., Suite 219
Encino, CA 91316
Telephone: 747.233.7150
Facsimile:   747.233.7143

Attorneys for Plaintiffs
ZENITH INSURANCE COMPANY and
ZNAT INSURANCE COMPANY

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ZENITH INSURANCE COMPANY and ZNAT INSURANCE COMPANY, | Civil Action No.: 2:18-cv-08479 |
| *Plaintiffs*, | |
| v. | |
| AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; McKESSON CORPORATION; PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; | |

JANSSEN PHARMACEUTICALS, INC.;
ORTHO- MCNEIL-JANSSEN
PHARMACEUTICALS, INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
JANSSENPHARMACEUTICA INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
NORAMCO, INC.; ENDO HEALTH
SOLUTIONS, INC.; ENDO
PHARMACEUTICALS, INC.;
ALLERGAN PLC f/k/a ACTAVIS PLS;
WATSON PHARMACEUTICALS, INC.
n/k/a ACTAVIS, INC.; WATSON
LABORATORIES, INC.; ACTAVIS LLC;
ACTAVIS PHARMA, INC. f/k/a
WATSON PHARMA, INC.;
MALLINCKRODT PLC and
MALLINCKRODT LLC.,

        *Defendants*.

---

## COMPLAINT

      Plaintiffs  ZENITH INSURANCE COMPANY (hereinafter, "Zenith") and ZNAT INSURANCE COMPANY (hereinafter, "ZNAT") bring this Complaint against Defendants Purdue Pharma L.P.; Purdue Pharma, Inc.; The Purdue Frederick  Company,  Inc.;  Teva  Pharmaceutical  Industries, LTD.;  Teva Pharmaceuticals USA, Inc.;  Cephalon, Inc.; Johnson & Johnson;  Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen  Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica Inc. n/k/a  Janssen Pharmaceuticals, Inc.; Noramco, Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals,  Inc.; Allergan PLC f/k/a Actavis PLS; Watson Pharmaceuticals, Inc. n/k/a Actavis, Inc.; Watson  Laboratories,  Inc.;  Actavis,  LLC;  Actavis  Pharma,  Inc.  f/k/a Watson Pharma,  Inc.;  Mallinckrodt  plc;  Mallinckrodt  LLC;  McKesson  Corporation;

Cardinal Health, Inc.; and AmerisourceBergen Drug Corporation (collectively "Defendants") and allege as follows:

## INTRODUCTION

1.      Plaintiffs bring this civil action to recover monetary losses that have been incurred as a direct and proximate result of Defendants' false, deceptive, and unfair marketing and/or unlawful diversion of prescription opioids.  Such economic damages were foreseeable to Defendants and were sustained because of Defendants' actions and omissions.

2.      Plaintiffs bring this suit against the manufacturers of prescription opioids.  The manufacturers promoted, marketed, and advertised prescription opioids which have been determined to be addictive, unnecessary in certain cases, and dangerous by falsely representing to doctors that patients' risk of drug addiction was low. These pharmaceutical companies advertised to and persuaded healthcare providers to prescribe addictive and unnecessary opioids.

3.      Plaintiffs also bring this suit against the wholesale distributors of prescription opioids.  The distributors and manufacturers unlawfully breached their legal duties under federal law to monitor, detect, investigate, and report suspicious orders of prescription opiates.

## PARTIES

**A.    Plaintiffs**

4.      At all times relevant, ZENITH was a corporation organized under the laws of California with its principal place of business at 21255 Califa Street, Woodland Hills, California 91367 and was engaged in the insurance business throughout the United States, including, but not limited to, California.

5.      At all times relevant, ZNAT was a corporation organized under the laws of California with its principal place of business at 21255 Califa Street,

---

**3**
**COMPLAINT**

Woodland Hilles, California 91367 and was engaged in the insurance business throughout the United Stated, including, but not limited to, California.

6.    At all relevant times, Plaintiffs have paid and/or provided reimbursement for some or the entire purchase price for prescription opioids pursuant to its policies of insurance, including, but not limited to, workers compensation policies, medical payments made pursuant to general liability insurance policies, medical payments pursuant to vehicle insurance policies, and medical payments made pursuant to property insurance policies.

## B.    Manufacturer Defendants

7.    At all relevant times, the Manufacturer Defendants identified and discussed *infra* in this paragraph B have packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted, and purported to warn and/or inform their users and prescribers about the risks, benefits, and effectiveness associated with the use of prescription opioid drugs. At all times relevant, the Manufacturer Defendants have manufactured and sold prescription opioid drugs without fulfilling their legal duty to prevent diversion and report suspicious orders.

### *Purdue*

8.    PURDUE PHARMA L.P. is a privately held limited partnership organized under the laws of Delaware, with its principle place of business in Stamford, Connecticut.

9.    PURDUE PHARMA INC. is a privately held New York corporation, with its principal place of business in Stamford, Connecticut.

10.    THE PURDUE FREDERICK COMPANY, INC. is a privately held New York corporation, with its principal place of business in Stamford, Connecticut.

11.    At all relevant times, PURDUE PHARMA L.P., PURDUE PHARMA INC., THE PURDUE FREDERICK COMPANY, INC., (collectively referred to as

"Purdue" hereafter) developed, promoted, sold, and distributed prescription opioids in the United States, including but not limited to the following:

| Drug Name | Chemical Name | Schedule |
|-----------|---------------|----------|
| OxyContin | Oxycodone hydrochloride extended release | II |
| MS Contin | Morphine sulfate extended release | II |
| Dilaudid | Hydromorphone hydrochloride | II |
| Dilaudid-HP | Hydromorphone hydrochloride | II |
| Butrans | Burenorphine | III |
| Hysingla ER | Hydrocodone bitrate | II |
| Targiniq ER | Oxycodone hydrochloride and naloxone hydrochloride | II |

12.     Over half of Purdue's revenue stems from the sale of prescription opioids.[1]

13.     OxyContin is Purdue's best-selling opioid. Since 2009, Purdue 's national annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from 2006 sales of $800 million, despite Purdue and its top executives pleading guilty in 2007 to criminal charges in connection with Purdue's deceptive OxyContin marketing practices, discussed *infra*. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (i.e., painkillers).

*Cephalon*

14.     CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania.

15.     TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva LTD") is an Israeli Corporation with its principal place of business in Petah Tikva, Israel,

---

[1] Seam Deprez, The Lawyer Who Beat Big Tobacco Takes on the Opioid Industry, Bloomberg Businessweek (Oct. 5, 2017), available at https://www.bloomberg.com/news/features/2017-10-05/the-lawyer-who-beat-big-tobacco-takes-on-the-opioid-industry.

which in 2011 acquired Cephalon, Inc., which is now a subsidiary and wholly owned by Teva, LTD.

16.     TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a Delaware corporation which is a wholly owned subsidiary of Teva, LTD., and specializes in the manufacturing and marketing of generic drugs, including opioids.

17.     At all relevant times, Teva, LTD., Teva USA, and Cephalon, Inc. developed, promoted, marketed, and sold both brand name and generic versions of opioids in the United States, including but not limited to the following:

| Drug Name | Chemical Name | Schedule |
| --- | --- | --- |
| Actiq | Fentanyl citrate | II |
| Fentora | Fentanyl citrate | II |
| Generic oxycodone | Oxycodone hydrochloride | II |

18.     Teva Ltd., Teva USA, and Cephalon, Inc. work closely together to market and sell Cephalon products in the United States. Teva Ltd. conducts all sales and marketing activities for Cephalon in the United States through Teva USA and has done so since its October of 2011 acquisition of Cephalon. Teva Ltd. and Teva USA hold out Actiq and Fentora as Teva products to the public. Teva USA sells all former Cephalon branded products through its "specialty medicines" division. The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events.

19.     All of Cephalon's promotional websites, including those for Actiq and Fentora, display Teva Ltd.'s logo.[2] Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own, and its year-end report for 2012 - the year

[2] E.g., ACTIQ, http://www.actiq.com/ (displaying logo at bottom-left) (last visited Sept. 24, 2018).

immediately following the Cephalon acquisition -  attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's  specialty sales," including *inter alia* sales  of  Fentora®.[3] Through interrelated operations like these, Teva Ltd. operates in the United States through its subsidiaries Cephalon and Teva USA. The United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder.

20.     Teva, LTD., Teva USA, and Cephalon, Inc. are collectively referred to as "Cephalon" hereafter.

**Janssen**

21.     JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON (J&J), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

22.     NORAMCO, INC. ("Noramco") is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of J&J until July of 2016.

23.     ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.

24.     JANSSEN PHARMACEUTICA INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.

---

[3] Teva Ltd., Annual Report (Form 20-F) 62 (Feb. 12, 2013), hannualreports.com/HostedData/AnnualReportArchive/t/NASDAQ_TEVA_2012.pdf

25.    J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. Further J&J is one of the world's largest legal poppy growers, supplying precursor opium for much of the hydrocodone and oxycodone consumed in the United States. Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., Noramco, and J&J are referred to as "Janssen."

26.    At all relevant times, Janssen developed, promoted, marketed, and sold opioids in the United States, including but not limited to the following:

| Drug Name | Chemical Name | Schedule |
|-----------|---------------|----------|
| Duragesic | Fentanyl | II |
| Nucynta | Tapentadol | II |
| Nicynta ER | Tapentadol extended release | II |
| Ultram | Tramadol hydrochloride | IV |

### *Endo*

27.    ENDO HEALTH SOLUTIONS, INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS, INC. is a wholly owned subsidiary of Endo Health Solutions, Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Health Solutions, Inc. and Endo Pharmaceuticals, Inc. are referred to as "Endo."

28.    At all times relevant, Endo developed, promoted, marketed, and sold opioids in the United States, including but not limited to the following:

| Drug Name | Chemical Name | Schedule |
|---|---|---|
| Opana ER | Oxymorphone hydrochloride extended release | II |
| Opana | Oxymorphone hydrochloride | II |
| Percodan | Oxycodone hydrochloride and aspirin | II |
| Percocet | Oxycodone hydrochloride and acetaminophen | II |
| Zydone | Hydrocodone bitartrate and acetaminophen | III |
| Generic Oxycodone | Oxycodone hydrochloride | II |
| Generic Oxymorphone | Oxymorphone hydrochloride | II |
| Generic Hydromorphone | Hydromorphone hydrochloride | II |
| Generic Hyrdocodone | Hydrocodone | II |

29.     Endo manufactures and sells its generic opioids both directly and through its subsidiary, Qualitest Pharmaceuticals, Inc.

30.     In 2017 Endo removed Opana ER from the market due to serious risks of abuse.[4]

**Allergan/Actavis**

31.     ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ACTAVIS PLC acquired ALLERGAN PLC in March 2015, and the combined company changed its name to ALLERGAN PLC in January 2013. Prior to that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013 and then ACTAVIS PLC in October 2013. WATSON LABORATORIES, INC. is a Nevada

---

[4] See Opana Form 10-Q for the quarter ended June 30, 2017, at pg. 22, available at http://www.endo.com/investors/sec-filings.

corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of ALLERGAN PLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.).  ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey and was formerly known as WATSON PHARMA, INC. ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.

32.     Each of the Defendants in Paragraph 31 of this Complaint is owned by ALLERGAN PLC, which uses them to market and sell its drugs in the United States. Upon information and belief, ALLERGAN PLC exercises control over these marketing and sales efforts and profits from the sale of Allergan/Actavis products ultimately inure to its benefit. ALLERGAN PLC, ACTAVIS PLC, ACTAVIS, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are referred to as "Actavis."

33.     At all times relevant, Defendant Actavis developed, promoted, marketed, and sold opioids in the United States, including but not limited to the following:

| Drug Name | Chemical Name | Schedule |
|---|---|---|
| Kadian | Morphine sulfate extended release | II |
| Norco | Hydrocodone bitartrate and acetaminophen | II |
| Generic Duragesic | Fentanyl | II |
| Generic Kadian | Morphine sulfate extended release | II |
| Generic Opana | Oxymorphone hydrochloride | II |

*Mallinckrodt*

34.    MALLINCKRODT, PLC is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with its U.S. headquarters in St. Louis, Missouri. MALLINCKRODT, LLC is a limited liability company organized and existing under the laws of the State of Delaware. Mallinckrodt, LLC has no members that are citizens of the State of California and is a wholly owned subsidiary of Mallinckrodt, plc.  Mallinckrodt, plc and Mallinckrodt, LLC are referred to as "Mallinckrodt."

35.    At all times relevant, Mallinckrodt manufactured, promoted, marketed, and sold opioids in the United States, including but not limited to the following:

| Drug Name | Chemical Name | Schedule |
|---|---|---|
| Generic oxycodone | Oxycodone hydrochloride | II |

36.    In July of 2017 Mallinckrodt agreed to pay $35 million to settle allegations brought by the Department of Justice that it failed to detect and notify the DEA of suspicious orders of controlled substances.

**C.    Distributor Defendants**

37.    At all relevant times, the Distributor Defendants identified and discussed *infra* in this Paragraph C have distributed, supplied, sold, and placed into the stream of commerce the prescription opioids, without fulfilling the fundamental duty of wholesale drug distributors to detect and warn of diversion of dangerous drugs for non-medical purposes. The Distributor Defendants universally failed to comply with federal law. Plaintiffs allege the unlawful conduct by the Distributor Defendants is responsible for the volume of prescription opioids introduced and currently in the United States Market.

38.    McKESSON CORPORATION ("McKesson") is a Delaware corporation, with its principal place of business located in San Francisco,

California. McKesson distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states.

39.     CARDINAL HEALTH, INC. ("Cardinal") is an Ohio corporation with its principal place of business located in Dublin, Ohio. Cardinal distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states.

40.     AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen") is a Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania. AmerisourceBergen distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states.

41.     JURISDICTION & VENUE

42.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO"). This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiffs' federal claims that they form part of the same case and controversy.

43.     This Court has personal jurisdiction over Defendants because all Defendants purposefully conduct substantial business in this State and in this judicial district.

44.     This Court also has personal jurisdiction over all of the Defendants under 18 U.S.C. § 1965(b). This Court may exercise nation-wide jurisdiction over the named Defendants where the "ends of justice" require national service and the plaintiff demonstrates national contacts. Here, the interests of justice require that Plaintiffs be allowed to bring all members of the nationwide RICO enterprise before the court in a single trial. See, e.g., Iron Workers Local Union No. 17 Insurance Fund v. Philip Morris Inc., 23 F.Supp.2d 796 (N.D. Ohio 1998) (citing LaSalle *National Bank v. Arroyo Office Plaza, Ltd.*, 1988 WL 23824, *3 (N.D. Ill.

Mar 10, 1988); *Butcher's Union Local No. 498 v. SDC Invest., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986)).

45.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because Plaintiffs ZENITH and ZNAT conduct and transact business in this judicial district, because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this judicial district, and under 28 U.S.C. § (b)(1) and § (c)(2), because all the Defendants are subject to personal jurisdiction in this state and in this judicial district, such that Defendants are deemed to reside in this state and in this judicial district.

46.    This Court should be made aware that this matter is directly related to the Judicial Panel on multi-district litigation entitled *In Re: National Prescription Opiate Litigation*, Case 17-MD-02804-DAP, coordinated in United States District Court for the Northern District of Ohio.

## FACTS

**A.    The Opioid Epidemic**

      **1.    Prescription Opioids and Their Adverse Effects**

47.     A majority of most prescription opioids are natural and semi synthetic drugs derived from opium. Prescription opioids include the prescription drugs identified in the preceding tables of this Complaint.

48.    Prescription opioids work by binding to receptors on the spinal cord and in the brain altering the perception of pain. Long-term exposure to opioids results in structural and functional changes in regions of the brain that regulate impulse control. Opioid addiction is a medical disease that arises from repeated exposure to opioids. It can occur in individuals using prescription opioids to relieve pain under the supervision of a physician at prescribed doses, just as it can occur in individuals using opioids for non-medical purposes.

49.     Prescription opioids are highly addictive based on a dual risk: (i) they induce euphoria (positive reinforcement), and (ii) cessation of chronic opioid use produces dysphoria (negative reinforcement) or withdrawal.[5]

50.     Discontinuing opioid use, even after just a few days of therapy, can cause patients to experience withdrawal symptoms. Withdrawal symptoms can include anxiety, nausea, vomiting, agitation, insomnia, muscle aches, abdominal cramping, and other serious conditions, which may persist for months or longer after a complete withdrawal from opioids, depending on how long the opioids were used.[6]

51.     When opioids are used over time, patients grow tolerant to their analgesic and euphoric effects, rendering the opioids ineffective as a pain treatment. As tolerance increases, a patient requires progressively higher doses in order to obtain the same levels of pain reduction to which he or she has become accustomed.[7]  At higher doses, the effects of withdrawal are more substantial, leaving a patient at an even higher risk of addiction.

52.     Up to the mid-1990s, the medical profession viewed opioids as having legitimate uses, but believed that they should be prescribed cautiously and only on a limited basis because of concerns about addiction, tolerance leading to dose escalation, and physiological dependence resulting in difficulty discontinuing use. Physicians were reluctant to prescribe opioids on a long-term basis for common chronic pain conditions because of their addiction risks and side effects.[8]

[5] Roy Wise et al., *The Development and Maintenance of Drug Addiction, Neuropsychopharmacology* (Nov. 6, 2013), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3870778/.
[6] See, e.g., *Health Guide:  Opiate Withdrawal*, The New York Times (2013), available at https://web.archive.org/web/20150502215837/http://www.nytimes.com:80/health/guides/disease/opiate-withdrawal/overview.html
[7] M. Katz, *Long-Term Opioid Treatment of Nonmalignant Pain:  A Believer Loses His Faith*, 170(16) Archives of Internal Med. 1422 (2010).
[8] Andrew Kolodny et al., *The Prescription Opioid and Heroin Crisis:  A Public Health Approach to an Epidemic of Addiction*, at pg. 562 (Jan. 12, 2015) (hereinafter "Kolodny, Jan. 12, 2015"), *available at* http://www.annualreviews.org/doi/pdf/10.1146/annurev-publhealth-031914-122957.

## 2. The Lack of Scientific Basis for the Effectiveness and Safety of Long Term Opioid Use

53. In March of 2016 the Center for Disease Control and Prevention ("CDC") developed the "CDC Guideline for Prescribing Opioids for Chronic Pain" in March 2016 (the "CDC Guideline"), which extensively discussed the lack of evidence supporting opioid use to treat long-term chronic pain.[9]

54. Specifically, the CDC Guideline stated that chronic pain is pain that generally lasts three months or longer.[10]

55. The CDC Guideline found there are no controlled studies of the use of opioids to treat chronic pain beyond twelve weeks, and no reliable evidence that opioids improve patients' pain and functioning longer term.[11]

56. The CDC Guideline concludes that "evidence on long-term opioid therapy for chronic pain outside of end-of-life care remains limited, with insufficient evidence to determine long-term benefits versus no opioid therapy."; and that "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later ...."[12]

57. The CDC Guideline also concludes that on the contrary to being a useful chronic pain reliever, "Extensive evidence shows the possible harms of opioids (including opioid use disorder, overdose, and motor vehicle injury)."[13]

58. The conclusions in the CDC Guideline are supported by a myriad of additional studies, including a 2011 systematic review of studies for non-cancer pain which found that evidence of long-term efficacy was "poor."[14]; a 2012 study

---

[9] *CDC Guidline for Prescribing Opioids for Chronic Pain – United States*, 2016 (March 18, 2016) (hereinafter "CDC Guideline, March 18, 2016"), *available at* https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf.
[10] *Id.* at 1.
[11] *Id.* at 2, 9.
[12] *Id.* at 9, 15.
[13] *Id.* at 15.
[14] L. Manchikanti et al., A Systematic Review of Randomized Trials of Long-Term Opioid Management for Chronic Non-Cancer Pain, Pain Physician (2011), available at https://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0032394/.

that found a lack of evidence of long-term efficacy for morphine, tramadol, and oxycodone, and only fair evidence for transdermal fentanyl (approved only for use for cancer pain).[15]; and a 2015 systematic review of the effectiveness and risks of long-term opioid therapy which found that the "[e]vidence is insufficient to determine the effectiveness of long-term opioid therapy for improving chronic pain and function."[16]

59.     Moreover, a study found that over time, even high doses of opioids often fail to control pain due to tolerance levels rising, and many patients exposed to such doses are unable to function normally.[17]

60.     For instance, studies of the use of opioids for chronic lower back pain have been unable to demonstrate an improvement in patients' function. Instead, research consistently shows that long-term opioid therapy for patients who have lower back injuries does not cause patients to return to work or physical activity sooner: "Opioids do not seem to expedite return to work in injured workers or improve functional outcomes of acute back pain in primary care. For chronic back pain, systematic reviews find scant evidence of efficacy....Given the brevity of randomized controlled trials, the long-term effectiveness and safety of opioids are unknown."[18]

61.     The February 2017 "Veterans Affairs/Department of Defense Clinical Practice Guideline for Opioid Therapy for Chronic Pain" sums up the ineffectiveness and lack of efficacy in opioids to treat chronic and/or long-term

---

[15] D. Koyyalagunta et al., *A Systematic Review of Randomized Trials on the Effectiveness of Opioids for Cancer Pain,* Pain Physician (2012), *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0052579/.
[16] Roger Chou et al., *The Effectiveness and Risks of Long-Term Opioid Therapy for Chronic Pain: A Systematic Review for a National Institutes of Health Pathways to Prevention Workshop,* Annals of Internal Medicine (Feb. 17, 2015), *available at* http://annals.org/aim/fullarticle/2089370/effectiveness-risks-long-term-opioid-therapy-chronic-pain-systematic-review.
[17] Andrea Rubinstein, *Are We Making Pain Patients Worse?,* Sonoma Medicine (Fall 2009), *available at* http://www.nbcms.org/about-us/sonoma-county-medical-association/magazine/sonoma-medicine-are-we-making-pain-patients-worse.aspx?pageid=144&tabid=747.
[18] Richard Deyo et al., *Opioidsfor Low Back Pain,* BMJ Publishing (Jan. 5, 2015), *available at* http://www.bmj.com/content/350/bmj.g6380.

pain by strongly recommending "against initiation of long-term opioid therapy for chronic pain."[19]

### 3.     The National Prescription Opioid Epidemic

62.     In the past two decades there has been an increase in the abuse and diversion of prescription opioid drugs in the United States.[20]

63.     Prescription opioids have become widely prescribed, so much so that in 2010 enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every four hours for one month.[21]

64.     By 2011, the U.S. Department of Health and Human Resources, Center for Disease Control and Prevention, declared prescription painkiller overdoses at epidemic levels, noting in a news release that more than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana), a total of 12 million people-reported using prescription painkillers non-medically according to the National Survey on Drug Use and Health, and that almost 5,500 people start to misuse prescription painkillers every day.[22]

65.     The number of annual opioid prescriptions now written in the United States is approximately equal to the number of adults in the population.[23]

66.     The societal costs of prescription drug abuse are "huge."[24]

---

[19] *Veterans Affairs/Department of Defense Clinical Practice Guideline for Opioid Therapy for Chronic Pain* (February 2017), available at https://www.healthquality.va.gov/guidelines/Pain/cot/VADoDOTCPG022717.pdf.

[20] Richard C. Dart et al, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J. Med. 241 (2015).

[21] Katherine M. Keyes et al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States,* 104 Am. J. Pub. Health e52 (2014).

[22] Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011) https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html

[23] Robert M. Califf et al, *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (2016).

[24] Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc., *Cardinal Health, Inc. v. United States Dept. Justice*, No. 12-5061 (D.C. Cir. May 9,2012), 2012 WL 1637016, at *10 [hereinafter Brief of HDMA].

67.    The CDC has reported that the past misuse of prescription opioids is the strongest risk factor for heroin initiation and use, specifically among persons who report past-year dependence or abuse.[25]

68.    The National Institute on Drug Abuse identifies misuse and addition to opioids as "a serious national crisis that affects public health as well as social and economic welfare."[26] The economic burden of prescription opioid misuse alone is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice expenditures.[27]

69.    Despite the aforementioned negative effects and reasonably foreseeable consequences that prescription opioids have had on society as a whole, the manufacturers and distributors of prescription opioids extract billions of dollars of revenue from the sale of prescription opioids in the United States.

70.    The prescription opioid manufacturers and distributors, including the Defendants, have continued their wrongful, intentional, and unlawful conduct, despite their knowledge that this conduct was and is causing, adding, and/or exacerbating the national opioid epidemic.

---

[25] Rose A. Rudd et al., *Increases in Drug and Opioid Overdoes Deaths—United States, 2000–2014,* 64 Morbidity & Mortality Wkly. Rep. 1378 (2016).
[26] Opioid Crisis, NIH, National Institute on Drug Abuse (available at https://www.drugabuse.gov/drugs-abuse/opioids/opioid-crisis, last visited Sept 24, 2018) (hereinafter "Opioid Crisis, NIH")
[27] *Id.*(citing *Id.* (citing at note 2 Florence CS, Zhou C, Luo F, Xu L, The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013, *MED CARE* 2016;54(10):901-906, doi:10.1097/MLR.0000000000000625).

**B.     The Manufacturer Defendants' False, Deceptive, And Unfair Marketing of Opioids**

71.     Manufacturer Defendants created a falsely favorable perception of prescription opioids through coordinated, sophisticated, and highly deceptive marketing that began in the mid-1990s and continues to the present.

72.     Prior to the 1990s, generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

73.     Each Manufacturer Defendant has conducted, and has continued to conduct, a marketing scheme designed to persuade doctors and patients that opioids can and should be used for chronic pain, resulting in opioid treatment for a far broader group of patients who are much more likely to become addicted and suffer other adverse effects from the long-term use of opioids. In connection with this scheme, each Manufacturer Defendant spent, and continues to spend, millions of dollars on promotional activities and materials that falsely deny or trivialize the risks of opioids while overstating the benefits of using them for chronic pain.

74.     The Manufacturer Defendants have made false and misleading claims, contrary to the language on their drugs' labels, regarding the risks of using their drugs that: (1) downplayed the serious risk of addiction; (2) created and promoted the concept of "pseudoaddiction" when signs of actual addiction began appearing and advocated that the signs of addiction should be treated with more opioids; (3) exaggerated the effectiveness of screening tools to prevent addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of

higher opioid dosages; and (6) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction. The Manufacturer Defendants have also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no scientifically reliable evidence to support the Manufacturer Defendants' claims.

75.    Manufacturer Defendants made and/or disseminated these misleading statements concerning both their own branded products and prescription opioids generally. Manufacturer Defendants made these misrepresentations directly in their own marketing materials and sales representatives, as well as indirectly through the use of third party vehicles including: (i) so-called "key opinion leaders" ("KOLs"), i.e., physicians who influence their peers' medical practices and prescribing behavior, who wrote favorable journal articles and delivered supportive educational courses; (ii) "unbranded" education materials for patients, physicians and others disseminated through groups purporting to be independent patient advocacy and professional organizations ("Front Groups"), which exercised influence through Manufacturer Defendant-controlled KOLs who served in leadership roles in these organizations and which were directly or indirectly controlled by Manufacturer Defendants; (iii) a body of biased and unsupported scientific literature which Manufacturer Defendants directly or indirectly created, funded, or exploited; (iv) so called "treatment guidelines" which Manufacturer Defendants formulated or caused to be formulated; and (v) Continuing Medical Education courses ("CMEs") prepared and/or funded in whole or in part by Manufacturer Defendants. These third parties and third party vehicles are collectively referred to herein as Defendants' "Third Party Allies."

76.    Defendants' efforts have been wildly successful. Opioids are now the most prescribed class of drugs. Globally, opioid sales generated $11 billion in revenue for drug companies in 2010 alone; sales in the United States have

exceeded $8 billion in revenue annually since 2009.[28]  In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors... [m]any of [whom] were even taught - incorrectly - that opioids are not addictive when prescribed for legitimate pain."[29] This epidemic has resulted in a flood of prescription opioids available for illicit use or sale (the supply), and a population of patients physically and psychologically dependent on them (the demand).

77.    The Manufacturer Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

## 1.    Multiple Avenues Manufacturer Defendants' used to Disseminate Their False and Deceptive Statements About Opioids

78.    The Manufacturer Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients throughout the United States. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout the United States.

79.    Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that the Manufacturer Defendants' messages are accurately and consistently delivered across marketing channels - including detailing visits, speaker events, and advertising - and in each sales territory.  The

---

[28] Katherine Eban, *Oxycontin: Purdue Pharma's Painful Medicine*, Fortune, Nov. 9, 2011, http://katherineeban.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine-fortune/;   David Crow, *Drugmakers Hooked on $10bn Opioid Habit*, Fin. Times, Aug. 10, 2016, https://www.ft.com/content/f6e989a8-5dac-11e6-bb77-a121aa8abd95.
[29] Letter from Vivek H. Murthy, U.S. Surgeon General (Aug. 2016), http://turnthetiderx.org/.

Manufacturer Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

80.    The Manufacturer Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks, sales training materials; and nationally coordinated advertising. The Manufacturer Defendants' sales representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide decks, and supervisors rode along with them periodically to both check on their performance and compliance.

### Direct Marketing

81.    The Manufacturer Defendants' direct marketing of opioids generally proceeded on two tracks. First, each Manufacturer Defendant conducted and continues to conduct advertising campaigns touting the purported benefits of their branded drugs. For instance, upon information and belief, the Manufacturer Defendants tripled their yearly spending in medical journals on the advertising of prescription opioids between 2001 and 2011.

82.    Many of the Manufacturer Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain. For instance, Endo distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs such as construction workers, chefs, and teachers, misleadingly implying that the drug would provide long-term pain-relief and functional improvement. Upon information and belief, Purdue also ran a series of ads, called "Pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One such ad described a "54-year-old

writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

83.     Second, each Manufacturer Defendant promoted the use of opioids for chronic pain through "detailers" - sales representatives who visited individual doctors and medical staff in their offices - and small-group speaker programs. The Manufacturer Defendants have not corrected this misinformation. Instead, each Defendant devoted massive resources to direct sales contacts with doctors. Upon information and belief, in 2014 alone, the Manufacturer Defendants spent in excess of $168 million on detailing branded opioids to doctors, more than twice what they spent on detailing in 2000.

84.     The Manufacturer Defendants' detailing to doctors was and remains effective. The Manufacturer Defendants purchased, manipulated and analyzed some of the most sophisticated data available in any industry, which was obtained from IMS Health Holdings, Inc., to precisely track the rates of initial prescribing and renewal by individual doctors, which in turn allows them to target, tailor, and monitor the impact of their core messages, allowing Manufacturer Defendants to know their sales representatives "detailing" efforts to doctors is effective.

85.     The Manufacturer Defendants' sales representatives and/or "detailers" have been reprimanded in the past for their deceptive practices and promotions. For instance, in March 2010 the FDA determined that Actavis had been distributing promotional materials that "minimize the serious and significant risks associated with Kadian" and misleadingly suggest that Kadian is safer than has been demonstrated.  Those materials in particular "fail to reveal warnings regarding potentially fatal abuse of opioids, use by individuals other than the patient for whom the drug was prescribed "[30]

---

[30] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Connc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010)
http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf

*Indirect Marketing*

86.    As discussed in Paragraph 74 of this Complaint, the Manufacturer Defendants' indirectly marketed their opioids using unbranded advertising, paid speakers and KOLs and Front Groups.

87.    The Manufacturer Defendants deceptively marketed opioids throughout the United States through unbranded advertising - e.g., advertising that promotes opioid use generally but does not name a specific opioid. This advertising was ostensibly created and disseminated by the Third Party Allies. But by funding, directing, reviewing, editing, and distributing this unbranded advertising, the Manufacturer Defendants controlled the deceptive messages disseminated by the Third Party Allies and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain. Much as Defendants controlled the distribution of their "core messages" via their own detailers and speaker programs, the Manufacturer Defendants similarly controlled the distribution of these messages in scientific publications, treatment guidelines, Continuing Medical Education ("CME") programs, and medical conferences and seminars. To this end, the Manufacturer Defendants used third-party public relations firms to help control those messages when they originated from the Third Party Allies.

88.    The Manufacturer Defendants marketed through third-party, unbranded advertising to avoid regulatory scrutiny because such advertising is not submitted to and typically is not reviewed by the FDA. The Manufacturer Defendants also used third-party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and objective source. Similar to the tobacco companies, the Manufacturer Defendants used third parties that they funded, directed, and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long term opioid use for chronic pain.

89.     Defendants also identified doctors to serve, for payment, on their "speakers' bureaus" and to attend programs with speakers and meals paid for by Defendants. These speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. These speakers give the false impression that they are providing unbiased and medically accurate presentations when they are, in fact, presenting a script prepared by Defendants. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

90.     The Manufacturer Defendants worked through their Third Party Allies, which they controlled, by: funding, assisting, encouraging, and directing doctors who served as KOLS; and funding, assisting, directing, and encouraging seemingly neutral and credible Front Groups. The Manufacturer Defendants then worked together with those KOLs and Front Groups to taint the sources that doctors and patients relied on for ostensibly "neutral" guidance, such as treatment guidelines, CME   programs, medical conferences and seminars, and scientific articles. As a result, the Manufacturer Defendants, working individually and collectively, and through these Front Groups and KOLs, they persuaded doctors and patients that what they have long known - that opioids are addictive drugs, unsafe in most circumstances for long-term use - was untrue, and that the compassionate treatment of pain required opioids.

91.     In 2007, multiple States sued Purdue for engaging in unfair and deceptive practices in its marketing, promotion, and sale of OxyContin, which resulted in a series Consent Judgments that prohibited Purdue from making misrepresentations in the promotion and marketing of OxyContin in the future. However, by utilizing the aforementioned indirect marketing strategies Purdue

intentionally circumvented the restrictions to which it had previously consented. Such actions include contributing to the creation of misleading publications and prescribing guidelines which lack reliable scientific basis and promote prescribing practices which have arguably contributed to the opioid crisis.

92.     Manufacturer Defendants' cultivation and utilization of pro-opioid doctors is one of the most important avenues that was used to spread their false and deceptive statements about the risks and benefits of long-term opioid use. The Manufacturer Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy. For instance, the State of New York found in its settlement with Purdue that the Purdue website "In the Face of Pain" failed to disclose that doctors who provided testimonials on the site were paid by Purdue and concluded that Purdue's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials.[31]

93.     Defendants utilized many KOLs, often times sharing or utilizing the same KOLs.

94.     Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom the Manufacturer Defendants identified and promoted to further their marketing campaign. Dr. Portenoy received research support, consulting fees, and honoraria from Cephalon, Endo, Janssen, and Purdue (among others), and was a paid consultant to Cephalon and Purdue. Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society ("APS") / American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of

---

[31] Press Release, New York State Office of the Attorney General, A.G. Schneiderman Announces Settlement With Purdue Pharma That Ensures Responsible And Transparent Marketing Of Prescription Opioid Drugs By The Manufacturer (Aug. 20, 2015) *available at* https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-purdue-pharma-ensures-responsible-and-transparent

opioids to treat chronic pain, first in 1996 and again in 2009. He was also a member of the board of the American Pain Foundation ("APF"), an advocacy organization almost entirely funded by the Manufacturer Defendants.

95.     Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations, such as his claim that "the likelihood that the treatment of pain using an opioid drug which is prescribed by a doctor will lead to addiction is extremely low." He appeared on a nationally televised broadcast of Good Morning America in 2010 to discuss the long-term use of opioids to treat chronic pain, whereon he claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."[32]

96.     Dr. Portenoy later admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true." These lectures falsely claimed that less than 1% of patients would become addicted to opioids. According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks. Dr. Portenoy conceded that "[d]ata about the effectiveness of opioids does not exist."[33] Dr. Portenoy candidly admitted to teaching about pain management through use of opioid therapy in a way that reflects misinformation.[34]

97.     Of course, Dr. Portenoy was not the only KOL.  Dr. Lynn Webster was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr. Webster was President of AAPM in 2013. He is a Senior Editor of Pain Medicine, the same journal that

---

[32] Good Morning American (ABC television broadcast Aug. 30, 2010)
[33] Thomas Catan & Evan Perez, A Pain-Drug Champion Has Second Thoughts, Wall St. J., Dec.7, 2012, https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.
[34] *Id.*

**27**
**COMPLAINT**

published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo, and Purdue. At the same time, Dr. Webster was receiving significant funding from the Manufacturer Defendants (including nearly $2 million from Cephalon).

98.     While acting as a KOL, Dr. Webster was under investigation for overprescribing by the U.S. Department of Justice's Drug Enforcement Agency, which raided his clinic in 2010. The investigation failed to yield charges, but twenty of Dr. Webster's former patients at the Lifetree Clinic have died of opioid overdoses.

99.     Notably, Dr. Webster created and promoted the Opioid Risk Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo, Janssen, and Purdue. Unaware of the flawed science and industry bias underlying this tool, certain states and public entities have incorporated the Opioid Risk Tool into their own guidelines, indicating, also, their reliance on the Manufacturer Defendants and those under their influence and control.

100.   Most notably, Dr. Webster also was a leading proponent of the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to increase a patient's dose of opioids. As he and co-author Beth Dove wrote in their 2007 book Avoiding Opioid Abuse While Managing Pain-a book that is still available online-when faced with signs of aberrant behavior, increasing the dose "in most cases . . . should be the

clinician's first response."[35] Upon information and belief, Endo distributed this book to doctors. Years later, Dr. Webster completely changed his position, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."[36]

101.   The Manufacturer Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain. Under the direction and control of the Manufacturer Defendants, these aforementioned "Front Groups" generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy. The Front Groups also assisted the Manufacturer Defendants by responding to negative articles, by advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and by conducting outreach to vulnerable patient populations targeted by the Manufacturer Defendants.

102.   The Front Groups depended on the Manufacturer Defendants for funding and, in some cases, for survival. The Manufacturer Defendants also exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. In doing so, the Manufacturer Defendants ensured that the Front Groups would generate only the messages that the Manufacturer Defendants wanted to distribute. Despite this, the Front Groups held themselves out as independent and serving the needs of their members - whether patients suffering from pain or doctors treating those patients.

103.   As previously eluded to, Defendants Cephalon, Endo, Janssen, and Purdue utilized many Front Groups, including many of the same ones. Several

---

[35] Lynn Webster & Beth Dove, *Avoiding Opioid Abuse While Managing Pain* (2007).
[36] John Fauber, Painkiller Boom Fueled by Networking, Milwaukee Wisc. J. Sentinel, Feb. 18, 2012, http://archive.jsonline.com/watchdog/watchdogreports/painkiller-boom-fueled-by-networking-dp3p2rn-139609053.html/

of the most prominent are described below, but there are many others, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), the Center for Practical Bioethics ("CPB"), the U.S. Pain Foundation ("USPF") and Pain & Policy Studies Group ("PPSG").[37]

104.   The most prominent of the Manufacturer Defendants' Front Groups was the American Pain Foundation ("APF"), which, upon information and belief, received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012, primarily from Endo and Purdue. APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF engaged in a significant multimedia campaign - through radio, television and the internet - to educate patients about their "right" to pain treatment, namely opioids. All the programs and materials were available nationally and  were intended to reach citizens of all 50 states.

105.   In 2009 and  2010,  more than 80% of APF's operating budget  came from pharmaceutical industry sources. Including industry grants for specific projects, APF received  about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total  income of about $3.5 million. By 2011, upon information and belief, APF was entirely dependent  on incoming grants from defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit.

106.   APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that

---

[37] *See generally, e.g.*, Letter from Sen. Ron Wyden, U.S. Senate Comm. on Fin., to Sec. Thomas E. Price, U.S. Dep't of Health and Human Servs., (May 5, 2015), https://www.finance.senate.gov/imo/media/doc/050817%20corrected%20Senator%20Wyden%20to%20Secretary%20Price%20re%20FDA%20Opioid%20Prescriber%20Working%20Group%20(5%20May%202017).pdf

might limit opioid prescribing, and thus the profitability of its sponsors. Upon information and belief, it was often called upon to provide "patient representatives" for the Manufacturer Defendants' promotional activities, including for Purdue's Partners Against Pain and Janssen's Let's Talk Pain. APF functioned largely as an advocate for the interests of the Manufacturer Defendants, not patients. Indeed, upon information and belief, as early as 2001, Purdue told APF that the basis of a grant was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

107.  Plaintiffs are informed, and believe, that on several occasions, representatives of the Manufacturer Defendants, often at informal meetings at conferences, suggested activities and publications for APF to pursue. In turn, APF would then submit grant proposals seeking to fund these activities and publications, knowing that Manufacturer Defendants and similar drug companies would support projects conceived as a result of these communications.

108.  The U.S. Senate Finance Committee began investigating APF in May of 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation caused considerable damage to APF's credibility as an objective and neutral third party, and the Manufacturer Defendants stopped funding it. Within days of being targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."[38]

109.  Another front group for the Manufacturer Defendants was the American Academy of Pain Medicine ("AAPM"). With the assistance, prompting, involvement, and funding of the Manufacturer Defendants, the AAPM issued purported treatment guidelines and sponsored and hosted medical education

---

[38] Charles Ornstein & Tracy Weber, Senate Panel Investigates Drug Companies' Ties to Pain Groups, Wash. Post, May 8, 2012, https://www.washingtonpost.com/national/health-science/senate-panel-investigates-drug-companies-ties-to-pain-groups/2012/05/08/gIQA2X4qBU_story.html?utm_term=.f88beae0fa17

programs essential to the Manufacturer Defendants' deceptive marketing of chronic opioid therapy.

110.   AAPM received substantial funding from opioid manufacturers, including some of the Manufacturer Defendants. For instance, AAPM maintained a corporate relations council, whose members paid $25,000 per year (aside from additional funding that was provided) to participate. The benefits of membership included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event - its annual meeting held in Palm Springs, California - or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Defendants Endo, Purdue, and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event.

111.   Upon information and belief, AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications. The conferences sponsored by AAPM heavily emphasized sessions on opioids - 37 out of approximately 40 at one conference alone. AAPM's presidents have included top industry-supported KOLs Perry Fine and the previously mentioned Dr. Lynn Webster. Dr. Webster was even elected president of AAPM while under a DEA investigation.

112.   The Manufacturer Defendants were able to influence AAPM through both their significant and regular funding and the leadership of the pro-opioid KOLS within the organization.

113.   In 1996, AAPM and APS jointly issued a consensus statement, "The Use of Opioids for the Treatment of Chronic Pain," which endorsed opioids to

treat chronic pain and claimed that the risk of a patients' addiction to opioids was low. Dr. Haddox, who co- authored the AAPM/APS statement, was a paid speaker for Purdue at the time. Dr. Portenoy was the sole consultant. The consensus statement remained on AAPM's website until 2011, and, upon information and belief, was taken down from AAPM's website only after a doctor complained.[39]

114.   AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain.[40] Treatment guidelines have been relied upon by doctors, especially the general practitioners and family doctors targeted by the Manufacturer Defendants. Treatment guidelines not only directly inform doctors' prescribing practices, but also are cited throughout the scientific literature and referenced by third- party payors in determining whether they should cover treatments for specific indications. Upon information and belief, pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

115.   At least fourteen of the twenty-one panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Cephalon, Endo, and Purdue. The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories.[41] One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Manufacturer

---

[39] *The Use of Opioids for the Treatment of Chronic Pain: A Consensus Statement From the American Academy of Pain Medicine and the American Pain Society*, 13 Clinical J. Pain 6 (1997).
[40] Roger Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-Cancer Pain*, 10 J. Pain 113 (2009).
[41] *Id.*

Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited hundreds of times in academic literature, were disseminated in the Plaintiffs' policyholders and claimants communities during the relevant time period, are still available online, and were reprinted in the Journal of Pain. The Manufacturer Defendants widely referenced and promoted the 2009 Guidelines without disclosing the lack of evidence to support them or the Manufacturer Defendants financial support to members of the panel.

116.   The Manufacturer Defendants worked together, through Front Groups, to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, Defendants combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project. PCF is comprised of representatives from opioid manufacturers (including Cephalon, Endo, Janssen, and Purdue) and various Front Groups, almost all of which received substantial funding from the Manufacturer Defendants. Among other projects, PCF worked to ensure that an FDA-mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which the Manufacturer Defendants determined would reduce prescribing.

### 2.    The Manufacturer Defendants' Marketing Scheme Misrepresented the Risks and Benefits of Opioids

117.   The Manufacturer Defendants created and utilized a campaign of false, deceptive, and unfair assurances that grossly understated and misstated the dangerous addiction risks of opioid drugs.

118.   To falsely assure physicians and patients that opioids are safe, the Manufacturer Defendants deceptively trivialized and failed to disclose the risks of

long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC, as discussed *supra*. These misrepresentations - which are described below - reinforced each other and created the dangerously misleading impressions that: (1) starting patients on opioids was low risk because most patients would not become addicted, and because those at greatest risk for addiction could be identified and managed; (2) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (3) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (4) abuse- deterrent opioids both prevent abuse and overdose and are inherently less addictive. The Manufacturer Defendants have not only failed to correct these misrepresentations, they continue to make them today.

119.   Opioid manufacturers, including Defendants Endo and Purdue, have entered into settlement agreements with public entities that prohibit them from making many of the misrepresentations identified in this Complaint. Yet even after entering in to these settlements, each Manufacturer Defendant continued to misrepresent the risks and benefits of long-term opioid use and each continues to fail to correct its past misrepresentations.

120.   Each of the Manufacturer Defendants' documents and other materials outlined below was to promote opioid sales and use so that doctors would prescribe them, patients would actively seek them, and insurers and health plan administrators would approve the drugs for inclusion in - and payment or reimbursement from - private and public health plans. These materials also encouraged doctors and others to continue or approve continuation of opioid therapy in the belief that failure to improve pain, function, or quality of life with initial doses of opioids could be overcome by increasing doses or prescribing additional short-acting opioids on an as-needed basis for breakthrough pain.

121.   In addition and as set forth above, Manufacturer Defendants ignored, however, not only that there was no evidence that opioids improved long-term functioning, but also a 2006 study of other studies that found that "[f]or functional outcomes ... other [non-opioid] analgesics were significantly more effective than were opioids."[42]

122.   As set forth previously, studies of the use of opioids for chronic conditions for which they are commonly prescribed, such as lower back pain, corroborate this conclusion and have failed to demonstrate an improvement in patients' function. For example, research consistently shows that long-term opioid therapy for patients who have lower back injuries does not lead patients to return to work or physical activity.[43]  Moreover, users of opioids had the highest increase in the number of headache days per month, scored significantly worse on the Migraine Disability Assessment (MIDAS), and had higher rates of depression, compared to non-opioid users.[44]

123.   Long-term use of opioids exposes users to a host of known, serious risks, including risks of misuse, abuse, addiction, overdose, and death. Chronic opioid therapy can also cause side effects including mental clouding and confusion, sleepiness, hyperalgesia, constipation, and immune-system and hormonal problems that degrade, rather than improve, patients' ability to function. Manufacturer Defendants omitted these adverse effects, as well as certain risks of drug interactions, from their publications and marketing efforts.

---

[42] Andrea D. Furlan et al., *Opioids for Chronic Noncancer Pain: A Meta-Analysis of Effectiveness and Side Effects*, 174(11) Can. Med. Ass'n J. 1589-1594 (2006), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1459894/. This study revealed that efficacy studies do not typically include data on opioid addiction, such that, if anything, the data overstate effectiveness.

[43] BA Martell et al., *Systematic Review: Opioid Treatment for Chronic Back Pain: Prevalence, Efficacy, and Association with Addiction,* Annals of Internal Medicine (2007), *available at* https://www.ncbi.nlm.nih.gov/pubmed/17227935; Richard Deyo et al., *Opioids for Low Back Pain,* BMJ Publishing (Jan. 5, 2015), *available at* http://www.bmj.com/content/350/bmj.g6380.

[44] *Survey: Migraine Patients Taking Potentially Addictive Barbiturate or Opioid Medications Not Approved by FDA as Migraine Treatments* (May 15, 2017), *available at* https://www.medicalnewstoday.com/releases/71758.php

124.   Each of the following specific statements by Manufacturer Defendants in their deceptive marketing of opioids falsely suggests that the long-term use of opioids actually improves patients' function and quality of life, and that scientific evidence supports such claims.

125.   These statements, which were directly contrary to the true facts, created a likelihood of confusion or misunderstanding as to the purported benefits of chronic opioid therapy, and, in particular, the ability of opioids to improve both patients' ability to function and quality of life. These statements were also likely to, and did, make a difference in consumers' and others' purchasing, prescribing, and reimbursing decisions, since they were designed to convince these members of Defendants' target audience that opioids were safe and effective, and to choose opioids over alternative treatment therapies for chronic pain:

### Allegran/Actavis

a. Documents from a 2010 sales training indicate that Actavis trained its sales force to instruct prescribers that "most chronic benign pain patients do have markedly improved ability to function when maintained on chronic opioid therapy. '[45]

b. Documents from a 2010 sales training indicate that Actavis trained its sales force that increasing and restoring function is an expected outcome of long-term Kadian therapy, including physical, social, vocational, and recreational function.[46]

c. Actavis distributed a product brochure and detailing document that claimed that use of Kadian to treat chronic pain would relieve "stress on your body and your mental health," allow patients to avoid "miss[ing] work," and cause patients to better enjoy their lives.[47] Government regulators warned Actavis that such claims were misleading, writing: "We are not aware of substantial evidence or

---

[45] *City of Chicago v. Purdue Pharma, et al.,* No. 14-cv-04361 (N.D. Ill.), Third Amended Complaint at ¶ 221, Oct. 25, 2016 (Dkt. 478) (hereinafter *"Chicago v. Purdue* Third Amend. Compl., Oct. 25, 2016"), *available at* https://www.feinberg.northwestern.edu/sites/ipham/conferences/globalhealthsymposium/docs/Third_Amended_Complaint_14_cv_04361.pdf

[46] *Id.*

[47] *See* Warning Letter *supra* note 30.

substantial clinical experience demonstrating that the magnitude of the effect of the drug has in alleviating pain, taken together with any drug related side effects patients may experience ... , results in an overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[48]  The regulators concluded that the representations were "false or misleading because they omit and minimize the serious risks associated with the drug, ... and present unsubstantiated superiority and effectiveness claims. . . . These violations are a concern from a public health perspective because they suggest that the product is safer and more effective than has been demonstrated. "[49]

d.  On information and belief, Actavis sales representatives told prescribers that prescribing Actavis' opioids would improve their patients' ability to function and improve their quality of life.

### Cephalon

e.  Cephalon sponsored the FSMB's *Responsible Opioid Prescribing* (2007), which taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a long-term therapeutic treatment course."[50]  Cephalon spent $150,000 to purchase copies of this book in bulk and distribute it through its pain sales force to 10,000 prescribers and 5,000 pharmacists.[51]

f.  Cephalon sponsored the American Pain Foundation's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids, when used properly "give [pain patients] a quality of life we deserve."[52]  The *Treatment Options* guide notes that non-steroidal anti-inflammatory drugs have greater risks associated with prolonged duration of use, but there was no similar warning for opioids. APF distributed 17,200 copies in one year alone according to

---

[48] *Id.*
[49] *Id.*
[50] https://academic.oup.com/painmedicine/article/16/5/1027/2460527/Responsible -Opioid-Prescribing-A-Clinicians-Guide; *Chicago v. Purdue* Third Amend. Compl. ¶ 221, Oct. 25, 2015, *supra* note 45.
[51] *Id.*
[52] https://ce4less.com/Tests/Materials/E019Materials.pdf.

its 2007 annual report.[53]  The publication is currently available online.[54]

g.  Cephalon sponsored a CME written by KOL Dr. Webster, titled *Optimizing Opioid Treatment for Breakthrough Pain,* which was offered online by Medscape, LLC from September 28, 2007 to December 15, 2008.[55]  The CME taught that Cephalon's Actiq and Fentora improve patients' quality of life and allow for more activities when taken in conjunction with long-acting opioids.

h.  Cephalon's 2006 marketing plan for marketing of Fentora, which was reviewed and approved at the highest levels of the company's management, was aimed at various types of pain management, including for "chronic pain patients," among other things. The marketing focus was to "generate awareness, understanding, and appropriate use of [Fentora] for breakthrough pain." A "target patient" was the patient "suffering from chronic pain."[56]

i.  On information and belief, Cephalon sales representatives told prescribers that opioids would increase patients' ability to function and improve their quality of life.

## Endo

j.  Endo sponsored a website, painknowledge.com, through APF and NIPC, which in 2009 claimed that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse."[57]  Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it.

k.  A CME sponsored by Endo, titled *Persistent Pain in the Older Patient,* taught that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." [58]

---

[53] *Chicago v. Purdue* Third Amend. Compl. ¶221, Oct. 25, 2016, *supra* note 45.
[54] *See supra* note 52.
[55] http://www.medscape.org/viewarticle/563417_6.
[56] Cephalon 2006 Marketing Plan for Fentora quoted in *US. v. Cephalon, Inc.,* No. 09-cv-02926 (E.D. Pa.) Fifth Amended Qui Tam Complaint at para. 66 (Sept. 13, 2013).
[57] *Chicago* v. *Purdue* Third Amend. Compl. ¶ 221, Oct. 25, 2016, *supra* note 45.
[58] *Id.* at ¶ 221.

l.   Endo distributed handouts to prescribers that claimed that use of Opana ER to treat chronic pain would allow patients to perform work, for example as a chef.[59]  The flyer also emphasized Opana ER s indication without including equally prominent disclosure of the 'moderate to severe pain' qualification.[60]

m.   Endo's sales force distributed FSMB's *Responsible Opioid Prescribing* (2007), which taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a "long-term therapeutic treatment course."[61]

n.   Endo provided grants to APF to distribute the book *Exit Wounds* (2009) to veterans, which taught that opioid medications *"increase your level of functioning"* (emphasis in original).[62]  *Exit Wounds* omitted warnings of the risk of interactions between opioids and benzodiazepines, which increase fatality risk. Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder.

o.   On information and belief, Endo sales representatives told prescribers that opioids would increase patients' ability to function and improve their quality of life.

### *Janssen*

p.   Janssen sponsored a patient education guide titled *Finding Relief Pain Management for Older Adults* (2009), which its personnel reviewed and approved, and its sales force distributed. This guide features a man playing golf on the cover and lists examples of expected functional improvement from opioids, like sleeping through the night, returning to work, recreation, walking, and climbing stairs. The guide states as a "fact" that "opioids may make it easier for people to live normally."[63] The myth/fact structure implies authoritative backing for the claims, which does not exist. The targeting of older adults also ignored heightened opioid risks in this population.

---

[59] *Id*. at ¶ 221.
[60] Warnings or limitations generally must be given equal prominence in product disclosures.
[61] *See supra* note 50; ¶ 221, Oct. 25, 2016, *supra* note 45.
[62] https://www.amazon.com/Survival-Management-Returning-Veterans-Families/dp/B002NRP2YC.
[63] *Chicago v. Purdue* Third Amend. Compl. ¶ 221, Oct. 25, 2016, *supra* note 45.

**40**
**COMPLAINT**

q.  Janssen sponsored, developed, and approved content of the website *Let's Talk Pain* in 2009, acting in conjunction with the APF, AAPM, and ASPMN, whose participation in *Let's Talk Pain* was financed and orchestrated by Janssen. This website featured an interview, which was edited by Janssen personnel, claiming that opioids were what allowed a patient to "continue to function," inaccurately implying that her experience would be representative of what other patients can expect to experience.[64]  This video is still available today on youtube.com.[65]

r.  Janssen provided grants to APF to distribute to veterans the book *Exit Wounds,* which taught that opioid medications *"increase* your level of functioning" (emphasis in original).[66]  *Exit Wounds* also *omits* warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk.

s.  On information and belief, Janssen sales representatives told prescribers that opioids would increase patients' ability to function and improve their quality of life.

**Purdue**

t.  Purdue's unbranded website *In the Face of Pain* (inthefaceofpain.com) contained testimonials from various "Advocates" who commented about opioids. One such advocate, Dr. Russell Portenoy, advocated the use of opioids because, in his words: "The negative impact of unrelieved pain on the lives of individuals ... is no longer a matter of debate. The unmet needs of millions of patients combine into a major public health concern."[67]  This statement was available on inthefaceofpain.com through at least 2014 and 2015.[68]  The New York Attorney General reached a settlement agreement with Purdue in 2015 regarding the misleading nature of these representations. See discussion *infra.*

---

[64] *Id.* at ¶ 221.
[65] https://www.youtube.com/user/LetsTalkPain.
[66] *See supra* note 62.
[67] Settlement Agreement between New York Attorney General and Purdue Pharma, at pg. 7 (Aug. 19, 2015) (hereinafter "NYAG-Purdue Settlement Agreement, Aug. 19, 2015"), *available at* https://ag.ny.gov/pdfs/Purdue-AOD-Executed.pdf.
[68] *Id.* at pg. 7.

u.  Purdue ran a series of advertisements for OxyContin in 2012 in
    medical journals titled "Pain Vignettes." They were case studies
    featuring patients, each with pain conditions persisting over several
    months, recommending OxyContin for each. One such patient, Paul,
    is described as a "54-year-old writer with osteoarthritis of the hands,"
    and the vignettes imply that an OxyContin prescription will help him
    work more effectively.[69]

v.  Purdue sponsored APF's *A Policymaker's Guide to Understanding
    Pain & Its Management* (2011), which inaccurately claimed that
    "multiple clinical studies" had shown that opioids are effective in
    "improving daily function, psychological health, and health-related
    quality of life for chronic pain patients."[70]  The guide is currently
    available online.[71]

w.  Purdue sponsored APF's *Treatment Options: A Guide for People
    Living with Pain* (2007), which counseled patients that opioids when
    used properly, "give [pain patients] a quality of life we deserve."[72]
    APF distributed 17,200 copies in one year alone, according to its 2007
    annual report.[73]  The guide is currently available online.[74]

x.  Purdue sponsored APF's book *Exit Wounds* (2009), which taught
    veterans that opioid medications *increase* your level of functioning
    (emphasis in original).[75]  *Exit Wounds* also omits warning of the risk
    of interactions between opioids and benzodiazepines, which would
    increase fatality risk.

y.  Purdue sponsored the FSMB's *Responsible Opioid Prescribing*
    (2007), which taught that relief of pain itself improved patients'
    function. *Responsible Opioid Prescribing* explicitly describes
    functional improvement as the goal of a "long-term therapeutic

[69] *Chicago v. Purdue* Third Amend. Compl. ¶ 221, Oct. 25, 2016, *supra* note 45.
[70] http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf
[71] *Id*.
[72] *See supra* note 52.
[73] *Chicago v. Purdue* Third Amend. Compl. ¶ 221 Oct. 25, 2016, *supra* note 45.
[74] *See supra* note 52.
[75] *See supra* note 62.

treatment course."[76]  Purdue also spent over $100,000 to support distribution of the book.[77]

z. On information and belief, Purdue sales representatives told prescribers that opioids would increase patients' ability to function and improve their quality of life.

### 3. In Their Deceptive Marketing, Manufacturer Defendants and Their Third Party Allies Omitted to Properly Disclose the Truth about the Risk of Addiction from Long Term Opioid Use

126.   The dangerous and deceptive failure to disclose the risks that opioids are highly addictive is central to Manufacturer Defendants' marketing.

127.   To reach chronic pain patients, Manufacturer Defendants and their Third Party Allies had to overcome doctors' legitimate fears that patients would become addicted. The risk of addiction is an extremely weighty risk, condemning patients to a disease that is chronic, progressive, and if not properly treated, often fatal. In addition, addiction recovery carries a lifetime risk of battling relapse.

128.   Absent Manufacturer Defendants' campaigns to convince doctors otherwise, it would be highly unlikely for a reasonable physician to find that the benefits from long-term opioid use for many aspects of chronic pain sufficiently outweighed the risks of addiction to justify writing the prescription.

129.   Through their well-funded, widespread, and comprehensive marketing efforts, Manufacturer Defendants and their KOLs and Front Groups were able to change the prescribing behavior of their peers despite the well-settled historical understanding and clear evidence that opioids taken long-term are very often addictive.

130.   Manufacturer Defendants and their Third Party Allies: (a) maintained that the risk of addiction for patients who take opioids long-term was low; and (b)

---

[76] *See supra* note 50; *Chicago v. Purdue* Third Amend. Compl. ¶ 221, Oct. 25, 2016, *supra* note 45.
[77] *Chicago v. Purdue* Third Amend. Compl. ¶221, Oct. 25, 2016, *supra* note 45.

failed to properly disclose the addiction risk as an adverse effect, even though the frequency and magnitude of the risk compelled disclosure.

131. Manufacturer Defendants also used code words that conveyed to prescribers and patients that their product was less prone to abuse and addiction than competitor products. For example, sales representatives for Defendants Actavis, Endo, Janssen, and Purdue promoted their drugs as having "steady-state" properties, implying that their drugs caused less of a rush or a feeling of euphoria, which can trigger abuse and addiction.

132. Further, Defendant Endo actively promoted its reformulated Opana ER on the basis that it was "designed to be crush-resistant," suggesting that Endo had succeeded in making the drug harder to adulterate and abuse.[78]

133. Similarly, Defendant Purdue falsely suggested that OxyContin was less likely to be abused.

134. Each of the statements alleged herein was created by Manufacturer Defendants with the expectation that, by instructing prescribers and patients that addiction rates are low, doctors would prescribe opioids to more patients. For example, one publication sponsored exclusively by Purdue, APF's *A Policymaker's Guide to Understanding Pain & Its Management* (2011), claimed that opioids are not prescribed often enough because of "misconceptions about opioid addiction."[79]

135. Acting directly or with and through third parties, each Manufacturer Defendant falsely claimed that the potential for addiction from opioids was relatively small, or non-existent, even though there was no scientific evidence to support those claims and the available research contradicted them. For example, a 2015 literature survey found that rates of "misuse" averaged between 21% and 29%, and rates of "addiction" ranged between 8% and 12%.[80]  These estimates are

---

[78] https://www.prnewswire.com/news-releases/endo-announces-fda-approval-of-a-new-formulation-of-opana-er-designed-to-be-crush-resistant-135431073.html
[79] *See supra* note 70.
[80] Kevin Vowles et al., *Rates of Opioid Misuse, Abuse, and Addiction in Chronic Pain: a Systematic Review and Data Synthesis,* 156 PAIN 569-76 (April 2015), *available at* https://insights.ovid.com/pubmed?pmid=25785523

well in line with Purdue's own undisclosed studies, showing that between 8% and 13% of OxyContin patients became addicted,[81] but on which Purdue chose not to rely, instead citing the Porter-Jick letter as evidence of non-addiction.

136.   Government regulators have noted that 26% of opioid patients obtain opioids from two or more prescribers, 16.5% seek early refills, and 20% use two or more pharmacies - all potential "red flags" for abuse or addiction.[82]  Regulators in fact have ordered manufacturers of long-acting opioids to "[c]onduct one or more studies to provide quantitative estimates of the serious risks of misuse, abuse, addiction, overdose and death associated with long-term use of opioid analgesics for management of chronic pain," in recognition of the fact that they found "high rates of addiction" in the medical literature.[83]

137.   The significant and growing incidence of abuse, misuse, and addiction to opioids are also powerful evidence that Manufacturer Defendants' statements regarding the low risk of addiction were, and are, untrue. This was well-known to or ignored by Defendants who had access to sales data and reports, adverse event reports, federal abuse and addiction-related surveillance data, and other sources that demonstrated the widening epidemic of opioid abuse and addiction.

138.   Acting directly or through and with third parties, Manufacturer Defendants claimed in their deceptive marketing that the potential for addiction from long-term use of opioids was relatively small or non-existent, despite the fact that the contention was false and there was no scientific evidence to support it. Manufacturer Defendants' efforts to trivialize and conceal the potential for abuse and addiction posed by opioids created a likelihood of confusion or

---

[81] Lawrence Robbins, *Long-Acting Opioids for Severe Chronic Daily Headache,* 10(2) Headache Quarterly 135 (1999); Lawrence Robbins, *Works in Progress: Oxycodone CR, a Long-Acting Opioid for Severe Chronic Daily Headache* 19 Headache Quarterly 305 (1999).

[82] Len Paulozzi, M.D. *Abuse of Marketed Analgesics and Its Contribution to the National Problem of Drug Abuse, available at* https://www.pdffiller.com/jsfiller-desk6/?projectId=222530239&expId=3863&expBranch=1#b65d87239de243fab7492dbca8453ff7

[83] September 10, 2013 letter from Bob Rappaport M.D., to NDA applicants of ER/LA opioid analgesics, *available at* http://www.fda.gov/downloads/Drugs/DrugSafety/InformationbyDrugClass/UCM367697.pdf; Woodcock Ltr., Sept. 10, 2013, *infra* note 170.

misunderstanding as to the safety of opioids, and falsely suggested that patients need not worry about addiction risks when using opioids for chronic pain management.

139. The misrepresentations included the following:

***Allegran/Actavis***

a. Documents from a 2010 sales training indicate that Actavis trained its sales force that long-acting opioids were less likely to produce addiction than short-acting opioids, although there is no evidence that either form of opioid is less addictive or that any opioids can be taken long-term without the risk of addiction.[84]

b. Actavis had a patient education brochure distributed in 2007 that claimed addiction is "less likely if you have never had an addiction problem."[85]  The overall presentation suggests the risk is so low as not to be a concern.

c. Kadian sales representatives told prescribers that Kadian was "steady state" and had extended-release mechanisms, the implication of which was that it did not produce a rush or euphoric effect, and therefore was less addictive and less likely to be abused.[86]

d. Kadian sales representatives told prescribers that the contents of Kadian could not be dissolved in water if the capsule was opened, implying that Kadian was less likely to be abused, and thereby less addictive, than other opioids.[87]

e. Actavis sales representatives omitted any discussion with prescribers of addiction risks related to Kadian. In fact, a July 2010 "Dear Doctor" letter mandated by government regulators required Actavis to acknowledge to the doctors to whom it marketed its opioid drugs that "[b]etween June 2009 and February 2010, Actavis sales representatives distributed ... promotional materials that ... omitted and minimized serious risks associated with [Kadian]," including the risk of"[m]isuse, [a]buse, and [d]iversion of [o]pioids" and,

---

[84] *Chicago v. Purdue* Third Amend. Compl. ¶ 229, Oct. 25, 2016, *supra* note 45.
[85] *Id.*
[86] *Id.*
[87]*Id.*

**46**
**COMPLAINT**

specifically, the risk that "[o]pioid[s] have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion."[88]

f.  On information and belief, Allergan/Actavis sales representatives omitted any discussion of addiction risks when discussing Allergan/Actavis opioid products with prescribers.

### Cephalon

g.  Cephalon sponsored and facilitated the development of a guidebook titled *Opioid Medications and REMS: A Patient's Guide,* which claims that "'patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids.[89]

h.  Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft.[90]  The guide is currently available online.[91]

i.  On information and belief, Cephalon sales representatives omitted any discussion of addiction risks when discussing Cephalon's opioid products with prescribers.

### Endo

j.  On Endo's website www.opana.com, Endo claimed until at least April 2012 that "[m]ost healthcare providers who treat patients with pain agree that patient treated with prolonged opioid medicines usually do not become addicted."[92]  The New York Attorney General investigated this statement, found that Endo had no evidence for the statement, and reached a settlement with Endo requiring corrective action.[93]  See discussion *infra*.

---

[88] *State of Ohio v. Purdue Pharma. et al.,* Common Pleas Court, Ross County, Ohio (May 31, 2017), Complaint, ¶ 40, *available at* http://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2017-05-31-Final-Complaint-with-Sig-Page.aspx.

[89] *Chicago v. Purdue* Third Amend. Compl. ¶ 229, Oct. 25, 2016, *supra* note 45.

[90] *See supra* note 52.

[91] *Id.*

[92] Settlement Agreement between New York Attorney General and Endo, at ¶ 20 (March 1, 2016) (hereinafter "NYAG-Endo Settlement Agreement, March 1, 2016"), *available at* https://ag.ny.gov/pdfs/Endo_ AOD_030116-Fully_ Executed.pdf.

[93] *Id.* at ¶ 20.

k.  Similarly, Endo also provided training materials to its sales representatives stating that addiction to opioids is not common, and that "symptoms of withdrawal do not indicate addiction."[94]  The New York Attorney General found that those statements were unwarranted. See discussion *infra.*

l.  Endo's advertisements for the 2012 reformulation of Opana ER claimed that it was designed to be crush resistant, conveying that it was less likely to be abused. This claim was false. Government regulators warned in a May 10, 2013 letter that there was no evidence that Endo's design would "provide a reduction in oral, intranasal or intravenous abuse," and that Endo's "post-marketing data submitted are insufficient to support any conclusion about the overall or route-specific rates of abuse."[95]

m.  Endo sponsored a website, painknowledge.com, through APF and NIPC which in 2009 claimed that "[p]eople who take opioids as prescribed usually do not become addicted."[96]  The overall presentation suggests that the risk is so low as not to be a concern. The language also implies that, as long as a prescription is given, opioid use will not become problematic. Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it.

n.  Endo sponsored a website, PainAction.com, which stated: "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."[97]

o.  Endo sponsored CMEs published by APF's NIPC, of which Endo was the sole funder, titled *Persistent Pain in the Older Adult and Persistent Pain in the Older Patient.* These CMEs claimed that opioids used by elderly patients present "possibly less potential for abuse than in younger patients" which lacks evidentiary support and deceptively minimizes the risk of addiction for elderly patients. [98]

---

[94] *Id.* at ¶ 22.
[95] *Chicago v. Purdue* Third Amend. Compl. ¶ 229, Oct. 25, 2016, *supra* note 45.
[96] *Id.*
[97] *Id.*
[98] *Id.*

p.  Endo distributed an education pamphlet with the Endo logo titled *Living with Someone with Chronic Pain,* which inaccurately minimized the risk of addiction, stating: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem."[99]

q.  Endo distributed a patient education pamphlet edited by KOL Dr. Portenoy titled *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004). It claimed that "[a]ddicts take opioids for other reasons [than pain relief], such as unbearable emotional problems."[100] This implies that pain patients prescribed opioids will not become addicted, which is unsupported and untrue. It is still available online today.[101]

r.  Endo contracted with the American Geriatrics Society ("AGS") to produce a CME promoting the 2009 Guidelines, titled *Pharmacological Management of Persistent Pain in Older Persons* (2009). The guidelines falsely claim that the "risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse."[102]  None of the references in the guidelines corroborates the claim that elderly patients are less likely to become addicted to opioids, and there is no such evidence. Endo was aware of the AGS guidelines' content when it agreed to provide its funding, and AGS drafted the guidelines with the expectation that it would seek drug company funding to promote them after their completion.

s.  Endo sales representatives told prescribers that its drugs were "steady state," implying that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused.[103]

t.  Endo provided grants to APF to distribute the book *Exit Wounds* (2009) to veterans, which taught that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications."[104]  The

---

[99] *Id.*
[100] https://www.yumpu.com/en/document/view/35479278/understanding-your-pain-taking-oral-opioid-analgesics
[101] *Id.*
[102] https://geriatricpain.org/sites/geriatricpain.org/files/wysiwyg_uploads/ags_pharmacological_management_of_persistent_pain_in_olders_persons_2009_2.pdf.
[103] *Chicago v. Purdue* Third Amend. Compl. ¶ 229, Oct. 25, 2016, *supra* note 45.
[104] *See supra* note 62.

overall presentation suggests that the risk is so low as not to be a concern.

u. On information and belief, Endo sales representatives omitted discussion of addiction risks related to Endo's opioid drugs when discussing Endo's opioid products with prescribers.

### Janssen

v. Janssen sponsored a patient education guide titled *Finding Relief Pain Management for Older Adults* (2009), which its personnel reviewed and approved and which its sales force distributed. This guide described a "myth" that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."[105]  The overall presentation suggests that the risk is so low as not to be a concern. The language also implies that as long as a prescription is given, opioid use is not a problem.

w. Janssen contracted with AGS to produce a CME promoting the 2009 Guidelines, titled *Pharmacological Management of Persistent Pain in Older Persons.* The guidelines falsely claim that the "risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse."[106]  The study supporting this assertion does not analyze addiction rates by age. As previously noted, addiction remains a significant risk for elderly patients. Janssen was aware of the AGS guidelines' content when it agreed to provide its funding, and AGS drafted the guidelines with the expectation that it would seek drug-company funding to promote them after their completion.

x. Janssen provided grants to APF to distribute the book *Exit Wounds* (2009) to veterans, which taught that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medication."[107]  The overall presentation suggests that the risk is so low as not to be a worry.

---

[105] *Chicago v. Purdue* Third Amend. Compl. ¶ 229, Oct. 25, 2016, *supra* note 45.
[106] *See supra* note 102.
[107] *See supra* note 62.

y.  Janssen ran a website, Prescriberesponsibly.com, which claimed that concerns about opioid addiction are "overstated."[108]

z.  A June 2009 Nucynta training module warned Janssen's sales force that physicians are reluctant to prescribe controlled substances like Nucynta, but this reluctance is unfounded because "the risks ... are much smaller than commonly believed."[109]

aa. Janssen sales representatives told prescribers that its drugs were "steady state," implying that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused.[110]

bb. Janssen sales representatives told prescribers that Nucynta and Nucynta ER were "not opioids," implying that the risks of addiction and other adverse outcomes associated with opioids were not applicable to these drugs. In truth, however, as set out in Nucynta's product label, Nucynta "contains tapentadol, an opioid agonist and Schedule II substance with abuse liability similar to other opioid agonists, legal or illicit."[111]

cc. Janssen's sales representatives told prescribers that Nucynta's unique properties eliminated the risk of addiction associated with the drug.[112]

dd. On information and belief, Janssen sales representatives omitted discussion of addiction risks related to Janssen's opioid drugs when discussing Janssen's opioid products with prescribers.

**Purdue**

ee. A 2017 study funded by Purdue to analyze medical costs associated with opioid addiction noted: "[N]early 100 million Americans live with chronic pain .... For moderate to severe pain, opioids can provide

---

[108] *Chicago v. Purdue* Third Amend. Compl. ¶ 229, Oct. 25, 2016, *supra* note 45.
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] *Id.*

significant symptom relief."[113]  The study made no reference to the distinction in addiction risks between short-term and long-term use.

ff.  Purdue published a prescriber and law enforcement education pamphlet titled *Providing Relief, Preventing Abuse* (2011), which under the heading "Indications of Possible Drug Abuse," shows pictures of the stigmata of injecting or snorting opioids- skin popping, track marks, and perforated nasal septa.[114]  In fact, opioid users who resort to these extremes are uncommon; the far more typical reality is patients who become dependent and addicted through oral use.[115]  Thus these representations deceptively reassured doctors that, as long as they do not observe those signs of misuse, they need not be concerned that patients are abusing or addicted to opioids.

gg. Purdue sponsored APF's *A Policymaker 's Guide to Understanding Pain & Its Management* (2011), which inaccurately claimed that less than 1% of children prescribed opioids will become addicted.[116]  The publication also asserted that pain is "undertreated" due to misconceptions about opioid addiction." The guide is currently available online.[117]

hh. Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which asserted that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft. The guide is currently available online.[118]

ii.  A Purdue-funded study with a Purdue co-author claimed that "evidence of the risk of psychological dependence or addiction is low in the absence of a history of substance abuse."[119]  The study relied only on the Porter-lick letter to the editor concerning a review of

---

[113] Noam Kirson et al., *The Economic Burden of Opioid Abuse: Updated Findings,* Journal of Managed Care & Specialty Pharmacy, at 427 (April2017), *available at* http://www.jmcp.org/doi/pdf/10.18553/jmcp.2017.16265.
[114] *Chicago v. Purdue* Third Amend. Compl. ¶ 229, Oct. 25, 2016, *supra* note 45.
[115] Purdue itself acknowledged in October 2010 that OxyContin was used non-medically by injection 4-17% of the time. *See Chicago v. Purdue* Third Amend. Compl. ¶ 229, Oct. 25, 2016, *supra* note 45.
[116] *See supra* note 70.
[117] *Id.*
[118] *See supra* note 52.
[119] Peter Watson et al., *Controlled-Release Oxycodone Relieves Neuropathic Pain: A Randomized Controlled Trial in Painful Diabetic Neuropathy,* 105 Pain 71 (2003), *available at* https://pdfs.semanticscholar.org/be4f/ff311b5869e11245dbc5ed433e59035d0f9c.pdf.

charts of hospitalized patients, not patients taking Purdue's long-acting, take-home opioid. The overall presentation suggests that the risk is so low as not to be a worry.

jj. Purdue contracted with AGS to produce a CME promoting the 2009 Guidelines titled *Pharmacological Management of Persistent Pain in Older Persons.* The guidelines falsely claim that the "risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse."[120]  None of the references in the guidelines corroborates the claim that elderly patients are less likely to become addicted to opioids and the claim is, in fact, untrue. Purdue was aware of the AGS guidelines' content when it agreed to provide its funding, and AGS drafted the guidelines with the expectation that it would seek Drug Company funding to promote them after their completion.

kk. Purdue sponsored APF's book *Exit Wounds* (2009), which counseled veterans that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications."[121]  The overall presentation suggests that the risk is so low as not to be a concern.

ll. Purdue sales representatives told prescribers that its drugs were "steady state," implying that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused.[122]

mm. Purdue sales representatives told prescribers that Butrans has a lower abuse potential than other drugs because it was essentially tamper-proof and after a certain point, patients no longer experience a "buzz from increased dosage.[123]

---

[120] *See supra* note 102.
[121] *See supra* note 62.
[122] *Chicago v. Purdue* Third Amend. Compl. ¶ 229, Oct. 25, 2016, *supra* note 45.
[123] *Id.*

nn. Advertisements that Purdue sent to prescribers stated that OxyContin ER was less likely to be favored by drug addicts, and, therefore, less likely to be abused or diverted, or result in addiction.[124]

oo. Purdue sales representatives emphasized that Purdue's ER/LA opioids (OxyContin, Butrans, and Hysingla) provide slow-onset, stable doses without "peaks and valleys" - encouraging prescribers to infer that these opioids are safer because they do not produce the euphoric high that fosters addiction. In a 2011 sales training document, Purdue acknowledged that the "fewer peaks and valley" message seen in a review of sales representative call notes was "problematic" confirming both that the statements were made and that they were false.[125]

pp. On information and belief, Purdue sales representatives omitted discussion of addiction risks related to Purdue's opioid drugs when discussing Janssen's opioid products with prescribers.

140. Rather than honestly disclose the risk of opioid abuse and addiction in their marketing materials, Manufacturer Defendants and their Third Party Allies improperly portrayed those who were concerned about addiction as unfairly denying treatment to needy patients. For example, to increase pressure on doctors to prescribe long-term opioid therapy, Manufacturer Defendants deceptively suggested that doctors who did not treat their patients' chronic pain with opioids were failing their patients and would potentially be subject to discipline.

141. Manufacturer Defendants and their Third Party Allies also claimed that overblown worries about addiction cause pain to be *under-treated* and cause opioids to be *under-prescribed* and over-regulated. This mantra reinforced Manufacturer Defendants' marketing messages that the risks of addiction and abuse were exaggerated and not significant.

---

[124] *Id.*
[125] *Attorney General of New Jersey v. Purdue Pharma, LP,* No. 245-17 (N.J. Super. Ct. Ch. Div. 2017), Complaint at ¶ 83, *available at* http://www.northjersey.com/story/news/new-jersey/2017/10/31/nj-sues-another-drug-company-opioid-crisis/816924001/.

142.   For example, Janssen's website *Let's Talk Pain* warned in a video posted online that: "[S]trict regulatory control has made many physicians reluctant to prescribe opioids. The unfortunate casualty in all of this is the patient, who is often undertreated and forced to suffer in silence."[126]  The program continued on to say: "Because of the potential for abusive and/or addictive behavior, many healthcare professionals have been reluctant to prescribe opioids for their patients . . . This prescribing environment is one of many barriers that may contribute to the undertreatment of pain, a serious problem in the United States."[127]

143.   Similarly, a Purdue website called *In the Face of Pain,* under the heading "Protecting Access," complains that, through mid-2013, policy governing the prescribing of opioids was "at odds" with best medical practices by: (i) "unduly restricting the amounts that can be prescribed and dispensed;" (ii) "restricting access to patients with pain who also have a history of substance abuse;" and (iii) "requiring special government-issued prescription forms only for the medications that are capable of relieving pain that is severe."[128]  This unsupported and untrue rhetoric aims to portray doctors who do not prescribe opioids as ignoring industry best practices, converting their desire to relieve patients' suffering into a mandate to prescribe opioids.

**4.    In Their Marketing, Manufacturer Defendants and Their Third Party Allies Misrepresented that Opioid Addiction Risk Can Be Avoided or Managed**

144.   Manufacturer Defendants continue to maintain that most patients can safely take opioids long-term for chronic pain without becoming addicted. Presumably to explain why doctors encounter so many patients addicted to opioids, Manufacturer Defendants and their Third Party Allies have come to admit that some patients could become addicted, but that doctors can avoid or manage

---

[126]  *Chicago v. Purdue* Third Amend. Compl. ¶ 229, Oct. 25, 2016, *supra* note 45.
[127]  *Id.*
[128]  *Id.*

that risk by using screening tools or questionnaires. These tools, they say, purport to identify those with allegedly higher addiction risks (stemming, for example, from personal or family histories of substance abuse or mental illness) so that doctors can more closely monitor patients at greater risk of addiction.

145.   Manufacturer Defendants' marketing assertions that doctors can readily identify and manage addiction risk are not true. There is no reliable scientific evidence that screening works to accurately predict risk or reduce rates of addiction, and there is no scientific evidence that screening or any other precautions can remove the risk of addiction.

146.   Despite the use of screening tools, patients with past substance use disorders which every tool rates as a risk factor receive, on average, higher doses of opioids from their physicians.

147.   In addition to making deceptive representations about screening, Defendant Purdue has deceptively marketed its so-called "abuse-deterrent" opioids - a reformulated version of OxyContin and Hysingla ER- in a manner that falsely implied these drugs can curb abuse and even addiction. In this marketing, which began in 2010, Purdue focused not on oral abuse, which is the most common form of prescription opioid abuse, but instead claimed that abuse and addiction result from product diversion, with abusers snorting or injecting the drug. Purdue misleadingly assured prescribers and other members of its target audience that its new formulation, which made its opioids more difficult to crush or inject, would prevent or reduce misuse, abuse, or diversion.

148.   Specifically, Purdue and its sales representatives have falsely claimed or implied that Purdue's abuse-deterrent formulations: (i) prevent tampering and cannot be crushed or snorted; (ii) prevent or reduce opioid abuse, diversion, and addiction overall; and (iii) are safer than other opioids. At the same time, Purdue either failed to disclose that the abuse-deterrent formulations do not impact the

most common form of abuse, oral ingestion, or affirmatively misrepresented that most abuse is by non-oral means.[129]

149.   In fact, there is no substantial scientific evidence that Purdue's abuse-deterrent opioids actually reduce opioid abuse. As the 2016 CDC Guideline states, "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," and the technologies, even when they work, "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes."[130]

150.   Purdue's deceptive marketing of the benefits of its abuse-deterrent formulations is particularly dangerous because it persuades doctors, who might otherwise curtail their opioid prescribing, to continue prescribing Purdue's opioids in the mistaken belief that they are safer. It also allows prescribers, patients, and other members of Purdue's target audience to discount evidence of opioid addiction and attribute it to other, less safe opioids - *i.e.,* to believe that while patients might abuse or overdose on non-abuse deterrent opioids, Purdue's opioids did not carry that risk.

151.   A 2014 *Evidence Report* by the Agency for Healthcare Research and Quality ("AHRQ"), which "systematically review[ed] the current evidence on long-term opioid therapy for chronic pain," identified "[n]o study" that had "evaluated the effectiveness of risk mitigation strategies, such as use of risk assessment instruments, opioid management plans, patient education, urine drug screening, prescription drug monitoring program data, monitoring instruments, more frequent monitoring intervals, pill counts, or abuse-deterrent formulations on outcomes related to overdose, addiction, abuse or misuse."[131]

---

[129] *See supra* note 125.
[130] *CDC Guideline,* March 18, 2016 at pg. 22 *supra* note 9; *see also* Theodore J. Cicero & Matthew J. Ellis, *Abuse-Deterrent Formulations and the Prescription Opioid Abuse Epidemic in the United States: Lessons Learned from OxyContin,* 72(5) JAMA Psychiatry 424-430 (May 2015).
[131] *The Effectiveness and Risks of Long-Term Opioid Treatment of Chronic Pain,* Agency for Healthcare Research and Quality (Sept. 19, 2014), *available at* https://effectivehealthcare.ahrq.gove/sites/default/files/pdf/chronic-pain-opioid-treatment_research.pdf.

152.   Manufacturer Defendants' representations that the risk of addiction could be readily avoided or managed, and Purdue's representations that its abuse-deterrent formulations could help thwart addiction and abuse, are deceptive and without scientific support, as described below. These misrepresentations by Manufacturer Defendants, which were intended to persuade prescribers, patients, and health care payors to choose opioids over competing medications and therapies, were likely to, and did, confuse, deceive, and mislead Manufacturer Defendants' target audience into believing that addiction, misuse, and abuse could easily be avoided or managed. Manufacturer Defendants' misrepresentations were not only likely to, but did in fact, make a difference in the purchasing and prescribing decisions of patients, doctors, and other third-party payors, as they minimized the risks associated with opioids for chronic pain, and influenced the public to choose opioids over other pain relief therapies.

153.   These misrepresentations included the following:

### Allergan/Actavis

a.   Documents from a 2010 sales training indicate that Actavis trained its sales force that prescribers can use risk screening tools to limit the development of addiction.[132]

### Cephalon

b.   Cephalon sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which taught patients that "opioid agreements" between doctors and patients can "ensure that you take the opioid as prescribed."[133]   The guide is currently available online.

### Endo

c.   Endo paid for a 2007 supplement available for CME credit in the Journal of Family Practice. This publication, titled Pain Management Dilemmas in Primary Care: Use of Opioids, recommended screening

---

[132] *Chicago v. Purdue* Third Amend. Compl. ¶ 238, Oct. 25, 2016, *supra* note 45.
[133] *See supra* note 52.

patients using tools like the Opioid Risk Tool or the Screener and Opioid Assessment for Patients with Pain, and advised that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.[134]

### *Purdue*

d. Purdue's unbranded website In the Face of Pain (inthefaceofpain.com) stated that policies that "restrict[] access to patients with pain who also have a history of substance abuse" and "requiring special government issued prescription forms for the only medications that are capable of relieving pain that is severe" are "at odds" with best medical practices.[135]  The New York Attorney General reached a settlement agreement with Purdue in 2015 regarding the misleading nature of this website. The New York Attorney General found that the website created a false impression of impartiality and concealed that Purdue made significant financial contributions to many paid speakers whose testimonial appeared on the website.[136]  See discussion *infra.*

e. Purdue sponsored a CME program taught by a KOL titled Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes (2012). This presentation recommended that use of screening tools, more frequent refills, and switching opioids could treat a high-risk patient showing signs of potentially addictive behavior.[137]

f. Purdue sponsored a 2011 webinar taught by KOL Dr. Webster, titled Managing Patient's Opioid Use: Balancing the Need and Risk. This publication taught prescribers that screening tools, urine tests, and patient agreements have the effect of preventing "overuse of prescriptions" and "overdose deaths."[138]

---

[134] *Chicago v. Purdue* Third Amend. Compl. ¶ 238, Oct. 25, 2016, *supra* note 45.
[135] *Id.*
[136] NYAG-Purdue Settlement Agreement, Aug. 19, 2015, at pg. 7-8, supra note 67.
[137] https://docmh.com/chronic-pain-management-and-opioid-use-easing-fears-managing-risks-and-improving-outcomes-pdf.
[138] *Chicago v. Purdue* Third Amend. Compl. ¶ 238, Oct. 25, 2016, *supra* note 45.

g.  On information and belief, Purdue sales representatives told prescribers that screening tools can be used to select patients appropriate for opioid therapy and to manage the risks of addiction.

h.  On information and belief, Purdue sales representatives told prescribers that Purdue's abuse-deterrent formulations of its oral opioids OxyContin and Hysingla are more difficult to abuse and less likely to be diverted.

**5. In Their Deceptive Marketing, Manufacturer Defendants and Their Third Party Allies Created Confusion as to Opioid Addiction Risks by Promoting the Misleading Term "Pseudoaddiction"**

154.  Manufacturer Defendants and their Third Party Allies developed and disseminated each of the following misrepresentations about "pseudoaddiction" so that, by instructing patients and prescribers that signs of addiction are actually the result of under-treated pain, doctors would prescribe more opioids to more patients and continue prescribing them, and patients would continue to use opioids despite signs of addiction.

155.  The concept of "pseudoaddiction" was coined by Dr. David Haddox, who went to work for Purdue, and popularized by KOL Dr. Portenoy, who consulted for Defendants Cephalon, Endo, Janssen, and Purdue. Much of the same language appears in other Defendants' treatments of this issue, blurring the line between undertreated pain and true addiction, as if patients could not experience both.

156.  KOL Dr. Webster subsequently conceded that: "[Pseudoaddiction] obviously became too much of an excuse to give patients more medication…It led us down a path that caused harm. It is already something we are debunking as a concept."[139]  Despite this partial confession, the Manufacturer Defendants actually continued and even increased their marketing campaign to downplay the risks of addiction.

---

[139] John Fauber et al., *Networking Fuels Painkiller Boom, supra* note 36.

157.   Each of the Manufacturer Defendants' statements identified below falsely states or suggests that the concept of pseudoaddiction is substantiated by scientific evidence and accurately describes the condition of undertreated patients who need, and should be treated with, more opioids. These misrepresentations, which were intended to persuade prescribers, patients, and third-party payors to choose opioids over competing medications and therapies, were likely to, and did, confuse, deceive, and mislead Manufacturer Defendants' target audience about the true safety of opioids and risks of addiction. These misrepresentations were not only likely to, but did in fact, make a difference in the purchasing and prescribing decisions of patients, doctors, and other third-party payors, as Manufacturer Defendants' misleading marketing promoted the concept of "pseudoaddiction" and thereby downplayed the true risks of addiction and convinced the public to choose opioids over other pain relief therapies.

158.   The misrepresentations included the following:

*Allergan/Actavis*

   a.   Documents from a 2010 sales training indicate that Actavis trained its sales force to instruct physicians that aberrant behaviors like self-escalation of doses constituted "pseudoaddiction. "[140]

*Cephlalon*

   b.   Cephalon sponsored FSMB' s Responsible Opioid Prescribing (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding opioids are all signs of "pseudoaddiction."[141]   Cephalon also spent $150,000 to purchase copies of the book in bulk and distributed it through its pain sales force to 10,000 prescribers and 5,000 pharmacists. [142]

---

[140] *Chicago v. Purdue* Third Amend. Compl. ¶ 240, Oct. 25, 2016, *supra* note 45.
[141] *Id.*
[142] *Id.*

*Endo*

    c. Endo distributed copies of a book by KOL Dr. Webster titled
*Avoiding Opioid Abuse While Managing Pain* (2007). Endo's internal
planning documents described the purpose of distributing this book as
to "[i]ncrease the breadth and depth of the Opana ER prescriber base."
The book claims that when faced with signs of aberrant behavior, the
doctor should regard it as "pseudoaddiction" and that "increasing the
dose in most cases ... should be the clinician's first response."[143]

    d. Endo spent $246,620 to buy copies of FSMB's Responsible Opioid
Prescribing (2007), which was distributed by Endo's sales force. This
book asserted that behaviors such as "requesting drugs by name,"
"demanding or manipulative behavior, seeing more than one doctor to
obtain opioids and hoarding, are all signs of 'pseudoaddiction'."[144]

    e. Endo trained its sales representatives to distinguish addiction from
"pseudoaddiction." The New York Attorney General reached a
settlement with Endo in 2016 regarding this representation and others,
finding that "the 'pseudoaddiction' concept has never been empirically
validated and in fact has been abandoned by some of its
proponents."[145]  See discussion *infra*.

*Janssen*

    f. From 2009 to 2011, Janssen's website *Let's Talk Pain* stated that
"pseudoaddiction ... refers to patient behaviors that may occur when
pain is under-treated" and that "[p]seudoaddiction is different from
true addiction because such behaviors can be resolved with effective
pain management."[146]

*Purdue*

    g. Purdue published a prescriber and law enforcement education
pamphlet titled *Providing Relief, Preventing Abuse* (2011), which
described "pseudoaddiction" as a concept that "emerged in the

---

[143] *Id.*

[144] *Id.*

[145] NYAG-Endo Settlement Agreement, March 1, 2016, at ¶ 23, *supra* note 92.

[146] *Chicago v. Purdue* Third Amend. Compl. ¶ 240, Oct. 25, 2016, *supra* note 45.

literature to describe the inaccurate interpretation of [addictive drug-seeking behaviors] in patients who have pain that has not been effectively treated."[147]

h.  Purdue distributed to physicians, and posted on its unbranded website *Partners Against Pain,* a pamphlet titled *Clinical Issues in Opioid Prescribing* (2006). This pamphlet included a list of conduct, including "illicit drug use and deception," that it defined as indicative of "pseudoaddiction" or undertreated pain. It also stated: "Pseudoaddiction is a term which has been used to describe patient behaviors that may occur when pain is undertreated. . . . Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief. Pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated."[148]

i.  Purdue sponsored FSMB's *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding opioids, are all signs of "pseudoaddiction."[149]  Purdue also spent over $100,000 to support distribution of the book.

j.  Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management* (2011), which stated: "Pseudo-addiction describes patient behaviors that may occur when pain is undertreated…Pseudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated."[150]  The guide is currently available online.

---

[147] *Id.*
[148] *Id.*
[149] *See supra* note 50; *Chicago v. Purdue* Third Amend. Compl. ¶ 240, Oct. 25, 2016, *supra* note 45.
[150] *See supra* note 70.

**6.    In Their Deceptive Marketing, Manufacturer Defendants and Their Third Party Allies Claimed that Opioid Withdrawal Symptoms Can Be Readily Managed**

159.   In an effort to further downplay the risks and devastating impact of addiction, Manufacturer Defendants and their Third Party Allies frequently claimed that, while patients become "physically" dependent on opioids, physical dependence can be adequately addressed by gradually tapering patients' doses to avoid the adverse effects of withdrawal. Manufacturer Defendants and their Third Party Allies promoted this false and misleading message so that prescribers and patients would be more likely to initiate long-term opioid therapy and would fail to recognize the actual risk of addiction.

160.   Manufacturer Defendants failed to properly disclose that discontinuing long-term use of opioids can be very difficult. These effects make it less likely that patients will be able to stop using opioids.

161.   In truth, physiological dependence on opioids starts to develop after a few days of regular use. Common withdrawal symptoms include severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, and pain, among other things.[151]

162.   Some symptoms may persist for months, or even years, after a complete withdrawal from opioids, depending on how long the patient had been using opioids. Withdrawal symptoms trigger a feedback loop that drives patients to return to opioids.

163.   Each of the Manufacturer Defendants' representations below falsely states or suggests that opioid withdrawal is manageable, so that physicians and users would increase opioid use.

164.   These misrepresentations, which were intended to persuade prescribers, patients, and third-party payors to choose opioids over competing

---

[151] *See, supra* note 6.

medications and therapies, were likely to, and did, confuse, deceive, and mislead Manufacturer Defendants' target audience about the difficulty of treating and managing withdrawal in opioid users. These misrepresentations were not only likely to, but did in fact, make a difference in the purchasing and prescribing decisions of patients, doctors, and other third-party payors. Manufacturer Defendants' misleading marketing was intended to minimize the reality of managing withdrawal symptoms, and thereby encourage the public to choose opioids over other pain relief therapies and to continue taking, prescribing, or paying for opioids when used to treat long-term pain.

165.   The misrepresentations included the following:
*Allergan/Actavis*

    a.  Documents from a 2010 sales training indicate that Actavis trained its sales force to convey that discontinuing opioid therapy can be handled "simply" and that it can be done at home. Actavis' sales representative training also claimed that opioid withdrawal would take only a week, even in addicted patients.[152]

*Endo*

    b.  CME sponsored by Endo, titled *Persistent Pain in the Older Adult,* taught that withdrawal symptoms can be avoided entirely by tapering the dose by 10-20% per day for ten days.[153]

*Janssen*

    c.  A Janssen PowerPoint presentation used for training its sales representatives titled *Selling Nucynta ER* indicated that the "low incidence of withdraw symptoms" is a "core message" for its sales force. This message was repeated in numerous Janssen training materials between at least 2009 and 2011. The studies purportedly supporting this claim did not describe withdrawal symptoms in patients taking Nucynta ER beyond 90 days or at high doses, and would therefore not be representative of withdrawal symptoms in the

---

[152] *Chicago v. Purdue* Third Amend. Compl. ¶ 244, Oct. 25, 2016, *supra* note 45.
[153] *Id.*

patient population taking long-term opioids. Patients on long-term treatment will have a harder time discontinuing the drugs and are more likely to experience withdrawal symptoms. In addition, in claiming a low rate of withdrawal symptoms, Janssen relied on a study that only began tracking withdrawal symptoms in patients two to four days after discontinuing opioid use. Janssen knew or should have known that these symptoms peak earlier than that for most patients. Relying on data after that initial window of severe withdrawal symptoms painted a misleading picture of the likelihood and severity of withdrawal associated with long-term opioid therapy. Janssen also knew or should have known that patients involved in the study were not taking the drug long enough to develop rates of withdrawal symptoms comparable to withdrawal symptoms suffered by patients who use opioids for chronic pain- a use for which Janssen promoted Nucynta ER.[154]

d. Janssen sales representatives told prescribers that patients on Janssen's opioid drugs were less susceptible to withdrawal than those on other opioids.[155]

### Purdue

e. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management* (2011), which taught that "Symptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," but did not disclose the significant hardships that often accompany cessation of use.[156] The guide is currently available online.

f. Purdue sales representatives told prescribers that the potential for withdrawal on Butrans was low due to Butrans' low potency and its extended release mechanism.[157]

g. In 2007, Purdue pled guilty to criminal charges stemming from its misleading marketing and promotion of OxyContin as having manageable withdrawal symptoms. Purdue admitted that it

---

[154] *Id.*
[155] *Id.*
[156] *See supra* note 70.
[157] *Chicago v. Purdue* Third Amend. Compl. ¶ 244, Oct. 25, 2016, *supra* note 45.

misrepresented to doctors that "patients could stop therapy abruptly without experiencing withdrawal symptoms and that patients who took OxyContin would not develop tolerance to the drug."[158]  See discussion *infra.*

    h. On information and belief, Purdue sales representatives told prescribers that the effects of withdrawal from opioid use can be reasonably managed.

### 7. In Their Deceptive Marketing, Manufacturer Defendants and Their Third Party Allies Improperly Minimized the Risks of Increased Doses of Opioids

166.   As part of their marketing campaign, Manufacturer Defendants and their Third Party Allies also claimed that prescribers and patients could increase doses of opioids indefinitely without added risk, even when pain was not decreasing or when doses had reached levels that were "frighteningly high." Manufacturer Defendants suggested that patients would eventually reach a stable, effective dose as the dosage strength increased.

167.   Each of the Manufacturer Defendants' representations also omitted warnings of increased adverse effects that occur at higher doses, and misleadingly suggested that there was no greater risk to higher dose opioid therapy.

168.   The Manufacturer Defendants made these misleading representations and omissions about the known risks of higher doses of opioids so that prescribers and patients would be more likely to continue to prescribe and use opioids. The misrepresentations also helped persuade physicians and patients not to discontinue opioids when patients' increased tolerance required them to seek higher doses.

169.   In fact, patients receiving increasingly higher doses of opioids as part of long term opioid therapy are three to nine times more likely to suffer an overdose than those on low doses. As compared to non-opioid pain remedies, an opioid patient's tolerance to pain-reducing properties of opioids develops faster

---

[158] https://archive.org/stream/279028-purdue-guilty-plea/279028-purdue-guilty-plea_djvu.txt.

than tolerance to the adverse respiratory effects of opioids. Thus, the practice of continuously escalating opioid doses to match pain tolerance can, in fact, lead to overdose due to respiratory complications even where opioids are taken as recommended in line with a patient's pain needs.

170.   Moreover, it is harder for patients to terminate use of higher-dose opioids without severe withdrawal effects. This contributes to a cycle of continued use, even when the drugs provide diminishing pain relief and are causing harm.

171.   Each of the representations from Manufacturer Defendants and their Third Party Allies misleadingly minimized the risks that increased doses of opioids pose to patients. These misrepresentations were likely to, and did, confuse, deceive, and mislead Manufacturer Defendants' target audience about the risks associated with higher doses of opioids to treat chronic pain. These misrepresentations and omissions were not only likely to, but did in fact, make a difference in the purchasing and prescribing decisions of patients, doctors, and other third-party payors, as Manufacturer Defendants' misleading marketing promoted the message that patients would not be at risk if they continued to increase their doses of opioids. This misleading message influenced Manufacturer Defendants' target audience to choose opioids over other non-opioid treatments and medications.

172.   The misrepresentations included the following:

*Allergan/Actavis*

   a.   Documents from a 2010 sales training indicate that Actavis trained its sales force that "individualization" of opioid therapy depended on increasing doses "until patient reports adequate analgesia" and to "set dose levels on [the] basis of patient need, not on [a] predetermined maximal dose." Actavis further counseled its sales representatives that the reasons some physicians had for not increasing doses indefinitely were simply a matter of physician "comfort level," which could be

**68**
**COMPLAINT**

overcome or used as a tool to induce them to switch to Actavis' opioid, Kadian.[159]

### Cephalon

b. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claimed that some patients "need" a larger dose of their opioid regardless of the dose currently prescribed.[160]  The guide is currently available online.

c. Cephalon sponsored a CME written by KOL Dr. Webster, titled *Optimizing Opioid Treatment for Breakthrough Pain,* which was offered online by Medscape, LLC in 2007 and 2008. The CME taught that non-opioid analgesics and combination opioids that include aspirin and acetaminophen are less effective to treat breakthrough pain because of dose limitations, implying that opioids benefitted from less restrictive dose limitations.[161]

d. On information and belief, Cephalon sales representatives assured prescribers that opioids were safe, even at high doses.

### Endo

e. Endo sponsored a website, painknowledge.com, through APF and NIPC, which in 2009 claimed that opioids may be increased until "you are on the right dose of medication for your pain." Endo funded the site which was a part of Endo's marketing plan and tracked visitors to it.[162]

f. Endo distributed a patient education pamphlet edited by KOL Dr. Portenoy titled *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004). It is still available online today.[163]  In Q&A format, it asked: "If I take the opioid now, will it work later when I really need it?" The response was: "The dose can be increased .... You won't 'run out' of pain relief."

---

[159]   *Chicago v. Purdue* Third Amend. Compl. ¶ 248, Oct. 25, 2016, *supra* note 45.
[160] *See supra* note 52.
[161] *See supra* note 55.
[162] *Chicago v. Purdue* Third Amend. Compl. ¶ 248, Oct. 25, 2016, *supra* note 45.
[163] *See supra* note 100.

*Janssen*

g.  Janssen sponsored a patient education guide entitled *Finding Relief Pain Management for Older Adults* (2009), which its personnel reviewed and approved, and its sales force distributed. This guide listed dose limitations as "disadvantages" of other pain medicines and omitted any discussion of risks of increased doses of opioids.[164]

*Purdue*

h.  Through at least June 2015, Purdue's website *In the Face of Pain,* along with initiatives of APF, promoted the notion that if a patient's doctor does not prescribe what - in their view - is a sufficient dose of opioid, they should find another doctor who will increase the dosage.[165]  In so doing, Purdue exerted influence over prescribers who face pressure to accede to the patients' demands for increased dosages.

i.  Purdue sponsored APF's *A Policymaker 's Guide to Understanding Pain & Its Management,* which taught that dose escalations are "sometimes necessary," even indefinitely high ones.[166]  This falsely suggested that high dose opioids are safe and appropriate. It did not disclose the risks from high dose opioids. The guide is currently available online.

j.  Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.[167]  The guide also claimed that some patients need a larger dose of the drug, regardless of the dose currently prescribed. This language failed to disclose the heightened risks at elevated doses. The guide is currently available online.

k.  Purdue sponsored a CME issued by the American Medical Association in 2007, 2010, and 2013. The CME, titled *Overview of Pain Management Option*, was edited by KOL Dr. Portenoy, among

---

[164] *Chicago v. Purdue* Third Amend. Compl. ¶ 248, Oct. 25, 2016, *supra* note 45.
[165] *Id.*
[166] *See supra* note 70.
[167] *See supra* note 52.

**70**
**COMPLAINT**

others, and taught that other drugs, but not opioids, are unsafe at high doses.[168]

l.   Purdue sales representatives told prescribers that high-dose opioids were effective for treating patients long-term and omitted any discussion that increased tolerance would require increased, and increasingly dangerous, doses.[169]

### 8.   In Their Deceptive Marketing of Opioids, Defendants and Their Third Party Allies Materially Overstated the Risks of Alternative Forms of Pain Treatment

173.   Manufacturer Defendants and their Third Party Allies also misleadingly emphasized or exaggerated the risks of alternative therapies, such as non-opioid analgesics. These misrepresentations, which were intended to persuade prescribers, patients, and health care payors to choose opioids over competing medications and therapies, were likely to, and did in fact, confuse, deceive, and mislead Manufacturer Defendants' target audience about the purported inferiority and dangers of non-opioid pain medications.

174.   Further, these misrepresentations were not only likely to, but did in fact, make a difference in the purchasing and prescribing decisions of patients, doctors, and other third-party payors, as Manufacturer Defendants' misleading marketing was *specifically designed* to encourage the purchasing, prescribing, and reimbursing public to choose opioids over other pain relief therapies.

175.   In connection with their inaccurate and unsupported emphasis on the purported risks of non-opioid products, Manufacturer Defendants and their Third Party Allies routinely minimized or ignored the risks of long-term opioid therapy. These opioid risks - which are in addition to the life-threatening risks associated with misuse, abuse, and addiction - include: hyperalgesia, a "known serious risk associated with chronic opioid analgesic therapy in which the patient becomes

---

[168] *Chicago v. Purdue* Third Amend. Compl. ¶ 248, Oct. 25, 2016, *supra* note 45.
[169] *Id.*

more sensitive to certain painful stimuli over time";[170] hormonal dysfunction; decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly; NAS (when an infant exposed to opioids withdraws from the drugs after birth); and potentially fatal interactions with alcohol and benzodiazepines which are used to treat posttraumatic stress disorder and anxiety (disorders frequently coexisting with chronic pain conditions), and other drugs.

176.   Despite these serious risks, Manufacturer Defendants asserted or implied that opioids were appropriate first-line treatments and safer than alternative non-opioid treatments, including nonsteroidal anti-inflammatory drugs ("NSAIDs") such as ibuprofen (Advil, Motrin) or naproxen (Aleve). While NSAIDs can pose gastrointestinal, renal, and cardiac risks, particularly for elderly patients, Manufacturer Defendants' exaggerated descriptions of those risks were improper, and made their omissions minimizing opioid risks all the more misleading.

177.   As part of this marketing ploy, Manufacturer Defendants and their Third Party Allies described over-the-counter NSAIDs as life-threatening and falsely asserted that they were responsible for 10,000 to 20,000 deaths annually (more than opioids), when in truth the number is closer to 3,200.[171]

178.   Manufacturer Defendants' description of NSAID risks starkly contrasted with Manufacturer Defendants' representation of opioid risks, which, according to Defendants, included mostly mild conditions such as nausea, constipation, and sleepiness (but not addiction, overdose, or death). In fact,

---

[170] Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013) (hereinafter "Woodcock Ltr., Sept. 10, 2013"), *available at* http://paindr.com/wp-content/uploads/2013/09/FDA_CDER_Response_to_Physicians_for_Responsible_Opioid_Prescribing_Partial_Petition_Approval_and_Denial.pdf.

[171] *See supra* note 52 at pg. 10; *see also* https://www.practicalpainmanagement.com/treatments/pharmacological/opioids/ask-expert-do-nsaids-cause-more-deaths-opioids.

compared with NSAIDs, prescription opioids are responsible for approximately five times as many fatalities annually.

179.   As with Manufacturer Defendants' other misrepresentations as alleged more fully herein, Manufacturer Defendants' misleading claims regarding the comparative risks of NSAIDs and opioids had the effect of shifting the balance of opioids' risks and purported benefits. While the volume of opioid prescriptions has exploded over the past two decades, the use of NSAIDs has declined during that same time.[172]

180.   Each of the following representations reflects deceptive claims and omissions by Manufacturer Defendants and their Third Party Allies about the risks of opioids relative to NSAIDs:

*Allergan/Actavis*

a. Documents from a 2010 sales training indicate that Actavis trained its sales force that the ability to escalate doses during long-term opioid therapy, without hitting a dose ceiling, made opioid use safer than other forms of therapy that had defied maximum doses, such as acetaminophen or NSAIDs.[173]

b. Actavis also trained physician-speakers that "maintenance therapy with opioids can be safer than long-term use of other analgesics," including NSAIDs, for older people.[174]

c. On information and belief, Actavis sales representatives told prescribers that NSAIDs were less beneficial or more risky than opioids.

---

[172] https://fitness.mercola.com/sites/fitness/archive/2013/08/16/back-pain-overtreatment.aspx.
[173] *Chicago v. Purdue* Third Amend. Compl. ¶ 252, Oct. 25, 2016, *supra* note 45.
[174] *Id.*

### *Cephalon*

d.  Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most Appropriate treatment for severe pain."[175]  The publication attributed 10,000 to 20,000 deaths annually to NSAID overdose. *Treatment Options* also warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids. The guide is currently available online.

e.  On information and belief, Cephalon sales representatives told prescribers that NSAIDs were less beneficial or more risky than opioids.

### *Endo*

f.  Endo distributed a "case study" to prescribers titled *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain.* The study cited an example, meant to be representative, of a patient with a "massive upper gastrointestinal bleed believed to be related to his protracted use of NSAIDs" (over eight years).[176]  The study recommended treating the patient with opioids instead.

g.  Endo sponsored a website, painknowledge.com, through APF and NIPC, which contained a flyer titled *Pain: Opioid Therapy.* This publication included a list of adverse effects from opioids that omitted significant adverse effects like hyperalgesia, immune and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death. Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it.[177]

h.  Endo provided grants to APF to distribute the book *Exit Wounds* (2009), which omitted warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. *Exit Wounds* also contained a lengthy discussion of the dangers of using

---

[175] *See supra* note 52.
[176] *Chicago v. Purdue* Third Amend. Compl. ¶ 252, Oct. 25, 2016, *supra* note 45.
[177] *Id.*

alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids.[178]

    i.    On information and belief, Endo sales representatives told prescribers that NSAIDs were less beneficial or more risky than opioids.

### Janssen

    j.    Janssen sponsored a patient education guide titled *Finding Relief Pain Management for Older Adults* (2009), which its personnel reviewed and approved, and its sales force distributed. This publication described the advantages and disadvantages of NSAIDs on one page, and the "myths/facts" of opioids on the facing page. The disadvantages of NSAIDs are described as involving "stomach upset or bleeding," "kidney or liver damage if taken at high doses or for a long time," "adverse reactions in people with asthma," and "increase [in] the risk of heart attack and stroke." The only adverse effects of opioids listed are "upset stomach or sleepiness" (which the brochure claims will dissipate), and constipation.[179]

    k.    Janssen sponsored APF's book *Exit Wounds* (2009), which omits warnings of the risk of interactions between opioids and benzodiazepines.[180] *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids.[181]

    l.    Janssen sales representatives told prescribers that Nucynta was not an opioid, making it a good choice for chronic pain patients who previously were unable to continue opioid therapy due to excessive side effects. This statement was misleading because Nucynta is, in fact, an opioid and has the same effects as other opioids.[182]

   m.  On information and belief, Janssen sales representatives told prescribers that NSAIDs were less beneficial or riskier than opioids.

---

[178] *See supra* note 62.
[179] *Chicago v. Purdue* Third Amend. Compl. ¶ 252, Oct. 25, 2016, *supra* note 171.
[180] *See supra* note 62.
[181] *See supra* note 62.
[182] *Chicago v. Purdue* Third Amend. Compl. ¶ 252, Oct. 25, 2016, *supra* note 45.

*Purdue*

n.  Purdue sponsored APF's book *Exit Wounds* (2009), which omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids.[183]

o.  Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which advised patients that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.[184]  The publication attributes 10,000 to 20,000 deaths annually to NSAID overdose. Treatment Options also warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids. The guide is currently available online.

p.  Purdue sponsored a CME issued by the American Medical Association in 2007, 2010, and 2013. The CME, titled *Overview of Management Options* was edited by KOL Dr. Portenoy, an1ong others, and taught that NSAIDs, but not opioids, are unsafe at high doses.[185]

q.  On information and belief, Purdue sales representatives told prescribers that NSAIDs were less beneficial or more risky than opioids.

**C.   Manufacturer Defendant's Misleading Marketing was Directed at a Broad Target Audience, Including Third-Party Payors Like Plaintiffs**

181.   Manufacturer Defendants' misleading marketing was directly and indirectly disseminated to Plaintiffs, Plaintiffs' agents, and other third-party payors, and other health plan administrators, with the intention that Plaintiffs,

---

[183] *See supra* note 62.
[184] *See supra* note 52.
[185] *Chicago v. Purdue* Third Amend. Compl. ¶ 252, Oct. 25, 2016, *supra* note 45.

Plaintiffs' agents, and other third-party payors, and other health plan/workers compensation plan administrators rely upon it.

182.   By directly and indirectly promoting opioids as safe and effective for long-term use using false and misleading statements, Manufacturer Defendants influenced Plaintiffs, Plaintiffs' agents, and other third party payors in the placement of opioids on their formularies and in paying or reimbursing for opioid prescriptions purely for financial gain.

183.   Manufacturer Defendants' deceptive and misleading marketing practices were widespread and succeeded in increasing the number of opioid prescriptions written and filled nationwide. Because Manufacturer Defendants misstated and withheld material information about the true safety and efficacy of opioids, Plaintiffs, Plaintiffs' agents, and other third-party payors, among others, did not have sufficiently complete information to make informed decisions regarding the safety and efficacy of prescription opioids and the listing of those drugs on their prescription drug formularies or those of their customers.

184.   During the relevant period covered by the Complaint, Plaintiffs were not aware of the deceptive nature of Manufacturer Defendants' marketing activities, and Plaintiffs paid for or reimbursed prescriptions filled on behalf of their policyholders and policyholders' claimants.

185.   Plaintiffs, Plaintiffs' agents, and other third-party payors were subject to and influenced by Manufacturer Defendants' misrepresentations and omissions regarding the purported safety and efficacy of prescription opioids, which in tum influenced the number of prescription opioids which they paid for or reimbursed. Plaintiffs, Plaintiffs' agents, and other third-party payors were influenced by Manufacturer Defendants' misrepresentations of opioids' safety and efficacy when approving and/or placing opioids on formularies. Plaintiffs, Plaintiffs' agents, and other Third-party payors were influenced by Manufacturer Defendants'

misrepresentations of opioids' safety and efficacy in reimbursing and/or paying for prescriptions of opioids on behalf of their members.

186.   The Plaintiffs and/or Plaintiffs' agents were subjected to Manufacturer Defendants' deceptive and misleading marketing activities, including misrepresentations and omissions about the purported safety and efficacy of opioids. Due to these activities, the Plaintiffs and or Plaintiffs' agents approved Manufacturer Defendants' prescription opioids for inclusion on the Plaintiffs' drug formulary and for which the Plaintiffs paid or reimbursed substantial sums. Inclusion of prescription opioids on these formularies led to the use of Manufacturer Defendants' prescription opioids by Plaintiffs' claimants.

187.   Manufacturer Defendants' actions were a substantial factor in causing the Plaintiffs to pay for opioids for chronic pain in the quantities and amounts that Plaintiffs did.

**D.   Guilty Pleas and Prior Attorney General Settlements with Certain Manufacturer Defendants in Connection with Improper Opioid Marketing**

**1.   Purdue's 2007 Guilty Plea for OxyContin Marketing Misrepresentation**

188.   In 2007, Purdue and three top executives were indicted in Virginia and pled guilty to fraud in promoting OxyContin as non-addictive and appropriate for chronic pain.

189.   As part of its guilty plea, Purdue admitted that:

Beginning on or about December 12, 1995, and continuing until on or about June 30, 2001, certain Purdue supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications, as follows:

* * *

b. [Purdue] told Purdue sales representatives they could tell health care providers that OxyContin potentially creates less chance for addiction than immediate-release opioids;

c. [Purdue] sponsored training that taught Purdue sales supervisors that OxyContin had fewer "peak and trough" blood level effects than immediate-release opioids resulting in less euphoria and less potential for abuse than short-acting opioids;

d. [Purdue] told certain health care providers that patients could stop therapy abruptly without experiencing withdrawal symptoms and that patients who took OxyContin would not develop tolerance to the drug; and

e. [Purdue] told certain health care providers that OxyContin did not cause a "buzz" or euphoria, caused less euphoria, had less addiction potential, had less abuse potential, was less likely to be diverted than immediate-release opioids, and could be used to "weed out" addicts and drug seekers.[186]

190. Under the plea agreement, Purdue agreed to pay $600 million in criminal and civil penalties- one of the largest settlements in history for a drug company's marketing misconduct.[187]  Also, Purdue's Chief Executive Officer, General Counsel, and Chief Medical Officer pled guilty and agreed to pay a total of $34.5 million in penalties.[188]

191. Purdue's wrongdoing continued basically unabated even with this prior plea and was and continues to be a key cog in the current opioid epidemic. Purdue's improper marketing campaign set the stage for a lengthy course of conduct in which Purdue and the other Defendants herein conditioned physicians to believe that opioids were safe and effective treatments for the long-term treatment of chronic pain.

---

[186] *See supra* note 158.
[187] *Id.*
[188] *Id.*

192.   Purdue made many subsequent misleading statements regarding its own opioid products and opioids generally, continuing long after its 2007 guilty plea as alleged herein.

**2.      Purdue's 2015 Settlement with the New York Attorney General**

193.   On August 19, 2015, the New York Attorney General ("NYAG") entered into a settlement agreement with Purdue regarding Purdue's marketing of opioids.

194.   In the settlement agreement, the NYAG noted that, from at least March 2014 to March 2015, the Purdue website www.inthefaceofpain.com failed to disclose that doctors who provided testimonials on the site were paid by Purdue. The NYAG concluded that Purdue's failure to disclose these financial connections misled consumers regarding the objectivity of the testimonials.

195.   The settlement agreement stated, in relevant part:

> Purdue maintains an unbranded pain management advocacy website, www.inthefaceofpain.com. From March 2014 to March 2015, the website received a total of 251,648 page views. Much of the video content on www.inthefaceofpain.com is also available on YouTube...
>
> Written and video testimonials from several dozen "Advocates," whose faces appear on the website and many of whom are HCPs [health care providers], comprise a central component of the site. For example, Dr. Russell Portenoy, the recipient of almost $4,000 from Purdue for meeting and travel costs, was quoted on the website as follows: "The negative impact of unrelieved pain on the lives of individuals and their families, on the healthcare system, and on society at large is no longer a matter of debate. The unmet needs of millions of patients combine into a major public health concern. Although there have been substantive improvements during the past several decades, the problem remains profound and change will require enormous efforts at many levels. Pressure from

patients and the larger public is a key element in creating momentum for change."

Although Purdue created the content on www.inthefaceofpain.com ...the site creates the impression that it is neutral and unbiased. However, prior to this investigation, the website failed to disclose that from 2008 to 2013, Purdue made payments totaling almost $231,000, for speaker programs, advisory meetings and travel costs, to 11 of the Advocates whose testimonials appeared on the site. The videos on YouTube also fail to disclose Purdue's payments to the Advocates.

*Purdue's failure to disclose its financial connections with certain Advocates has the potential to mislead consumers by failing to disclose the potential bias of these individuals.*[189]

196.   As part of the settlement, Purdue agreed to make certain disclosures on www.inthefaceofpain.com and its similar websites, and to pay a monetary penalty.[190]

197.   Again, however, Purdue's improper marketing of opioids has continued following its prior regulatory settlements, all as alleged more fully herein. As summarized in an October 30, 2017 article in *The New Yorker:*

Purdue has continued to fight aggressively against any measures that might limit the distribution of OxyContin, in a way that calls to mind the gun lobby's resistance to firearm regulations. Confronted with the prospect of modest, commonsense measures that might in any way impinge on the prescribing of painkillers, Purdue and its various allies have responded with alarm, suggesting that such steps will deny law-abiding pain patients access to medicine they desperately need. Mark Sullivan, a psychiatrist at the University of Washington, distilled the

---

[189] NYAG-Purdue Settlement Agreement, Aug. 19, 2015, at pg. 7-8 (emphasis added), *supra* note 67.
[190] *Id.* at pg. 15-17.

argument of Purdue: "Our product isn't dangerous- it's people who are dangerous."[191]

198.   Further, according to that article, Purdue has continued to search for new users through the present, both domestically and now increasingly overseas, and in August 2015 even sought to market OxyContin to children as young as 11.[192]

## 2. Endo's 2016 Settlement with the New York Attorney General

199.   On March 1, 2016, the NYAG entered into a settlement agreement with Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. regarding Endo's marketing and sales of Opana ER.

200.   On Endo's website www.opana.com, Endo claimed until at least April 2012 that "[m]ost] healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted."[193]  The NYAG found that Endo had no evidence for that statement.[194]

201.   Endo also provided training materials to its sales representatives stating that addiction to opioids is not common, and that "symptoms of withdrawal do not indicate addiction."[195]  The NYAG found that those statements were unwarranted.[196]

202.   Endo also trained its sales representatives to distinguish addiction from "pseudoaddiction." *The NYAG found that the "pseudoaddiction" concept has never been empirically validated* and has been abandoned by some of its proponents, all as alleged above.[197]

---

[191] Patrick Radden Keefe, *The Family That Built an Empire of Pain,* The New Yorker (Oct. 30, 2017), *available at* https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain.
[192] *Id.*
[193] NYAG-Endo Settlement Agreement, March 1, 2016, at ¶ 20, *supra* note 92.
[194] *Id.* at ¶ 20.
[195] *Id.* at ¶ 22.
[196] *Id.* at ¶ 22.
[197] *Id.* at ¶ 23.

203.   The NYAG also noted that Endo omitted information about certain studies in its marketing pamphlets distributed to health care providers, and that Endo "omitted ... adverse events from marketing pamphlets."[198]

204.   As part of the NYAG settlement, Endo agreed to refrain from doing the following in New York: (i) "make statements that Opana ER or opioids generally are non-addictive," (ii) "make statements that most patients who take opioids do not become addicted," and (iii) "use the term 'pseudoaddiction' in any training or marketing."[199]

205.   Endo also paid a $200,000 penalty in connection with the settlement.[200]

## E.   The Manufacturer Defendants made Materially Deceptive Statements and Concealed Material Facts

206.   As alleged herein, the Manufacturer Defendants made and/or disseminated deceptive statements regarding material facts and further concealed material facts, in the course of manufacturing, marketing, and selling prescription opioids. The Manufacturer Defendants' actions were intentional and/or unlawful. Such statements include, but are not limited to, those set out below and alleged throughout this Complaint.

207.   Defendant Purdue made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

    a.   Creating, sponsoring, and assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;

    b.   Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-

---

[198] *Id.* at ¶ 30.
[199] *Id.* at ¶ 41.
[200] *Id.* at ¶ 54.

term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c.  Disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through Purdue's own unbranded publications and on internet sites Purdue operated that were marketed to and accessible by consumers;

d.  Distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse;

e.  Sponsoring, directly distributing, and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

f.  Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g.  Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h.  Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.  Assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction;

j.  Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.  Developing and disseminating scientific studies that misleadingly concluded opioids are safe and effective for the long-term treatment

of chronic non- cancer pain and that opioids improve quality of life, while concealing contrary data;

l.  Assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic noncancer pain;

m.  Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

n.  Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

o.  Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

p.  Exclusively disseminating misleading statements in education materials to hospital doctors and staff while purportedly educating them on new pain standards;

q.  Making deceptive statements concerning the use of opioids to treat chronic noncancer pain to prescribers through in-person detailing; and

r.  Withholding from law enforcement the names of prescribers Purdue believe to be facilitating the diversion of its opioid while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs they knew would reach these same prescribers.

208.  Defendant Endo made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b. Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c. Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high risk patients;

d. Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

e. Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

f. Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g. Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h. Providing needed financial support to pro-opioid pain organizations, including over $5 million to the organization responsible for many of the most egregious misrepresentations, that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i. Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat

chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

j.  Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.  Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.  Directly distributing and assisting in the dissemination of literature written by pro- opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

m.  Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

n.  Making deceptive statements concerning the use of opioids to treat chronic non- cancer pain to prescribers through in-person detailing.

209.  Defendant Janssen made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.  Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.  Directly disseminating deceptive statements through internet sites over which Janssen exercised final editorial control and approval stating that opioids are safe and effective for the long-term

treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

c.  Disseminating deceptive statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through internet sites over which Janssen exercised final editorial control and approval;

d.  Promoting opioids for the treatment of conditions for which Janssen knew, due to the scientific studies it conducted, that opioids were not efficacious and concealing this information;

e.  Sponsoring, directly distributing, and assisting in the dissemination of patient education publications over which Janssen exercised final editorial control and approval, which presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;

f.  Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

g.  Providing necessary financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

h.  Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

i.  Targeting the elderly by sponsoring, directly distributing, and assisting in the dissemination of patient education publications targeting this population that contained deceptive statements about the

risks of addiction and the adverse effects of opioids, and made false statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and improve quality of life, while concealing contrary data;

j. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k. Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

l. Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

m. Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain; and

n. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

210.   Defendant Cephalon made and/or disseminated untrue, false and deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b. Sponsoring and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

c. Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and breakthrough chronic non-cancer pain;

d. Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non- cancer pain in conjunction with Cephalon's potent rapid-onset opioids;

e. Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

f. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

g. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of Cephalon's rapid-onset opioids;

h. Directing its marketing of Cephalon's rapid-onset opioids to a wide range of doctors, including general practitioners, neurologists, sports medicine specialists, and workers' compensation programs, serving chronic pain patients;

i. Making deceptive statements concerning the use of Cephalon's opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events, when such uses are unapproved and unsafe; and

j. Making deceptive statements concerning the use of opioids to treat chronic non- cancer pain to prescribers through in-person detailing and speakers' bureau events.

211.   Defendant Actavis made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.   Making deceptive statements concerning the use of opioids to treat chronic non- cancer pain to prescribers through in-person detailing;

b.   Creating and disseminating advertisements that contained deceptive statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life;

c.   Creating and disseminating advertisements that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain; and

d.   Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life while concealing contrary data.

**F.    The Manufacturer Defendants Deceptively Concealed Their Misconduct**

212.   The Manufacturer Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience, establish that opioids are highly addictive and are responsible for a long list of very serious adverse outcomes. The FDA warned Defendants of this, and Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and death - all of which clearly described the harm from long-term opioid use and that patients were suffering from addiction, overdose, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements, based on medical evidence, that conclusively expose the falsity

of Defendants' misrepresentations, and Endo and Purdue have recently entered agreements in New York prohibiting them from making some of the same misrepresentations described in this Complaint.

213.   At all times relevant to this Complaint, the Manufacturer Defendants took steps to avoid detection of and to deceptively conceal their deceptive marketing and unlawful, unfair, and deceptive conduct. For example, the Manufacturer Defendants disguised their role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. The Manufacturer Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of the Manufacturer Defendants' false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain. Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. The Manufacturer Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies that were not, and have not yet become, public. For example, PainKnowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other Manufacturer Defendants, such as Purdue and Janssen, ran similar websites that masked their own role.

214.   Finally, the Manufacturer Defendants manipulated their promotional materials and the scientific literature to make it appear that these documents were accurate, truthful, and supported by objective evidence when they were not. The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The Manufacturer Defendants invented "pseudoaddiction" and promoted it to an unsuspecting medical community. The Manufacturer Defendants provided the medical community with false and misleading information about ineffectual

strategies to avoid or control opioid addiction. The Manufacturer Defendants recommended to the medical community that dosages be increased, without disclosing the risks. The Manufacturer Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales.

**G.    The Distributor Defendants Unlawful Distribution of Opioids**

215.   The Distributor Defendants owe a duty under federal law (21 U.S.C. § 823, 21 CFR 1301.74) to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids as well as those orders which the Distributor Defendants knew or should have known were likely to be diverted.

216.   The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

217.   Each Distributor Defendant repeatedly and purposefully breached its duties under state and federal law. Such breaches are a direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes.

218.   The unlawful diversion of prescription opioids is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality.

219.   The Distributor Defendants' intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid epidemic and causing the damages alleged herein.

**1.      The Distributor Defendants Have a Duty under Federal Law to Guard Against, and Report, Unlawful Diversion and to Report and Prevent Suspicious Orders.**

220.   Opioids are a controlled substance. These "Schedule II" drugs are controlled substances with a "high potential for abuse." 21 U.S.C. §§ 812(b), 812(2)(A)-(C).

221.    Each Distributor Defendant was required to register with the DEA, pursuant to the federal Controlled Substance Act. See 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100. Each Distributor Defendant is a "registrant" as a wholesale distributor in the chain of distribution of Schedule II controlled substances with a duty to comply with all security requirements imposed under that statutory scheme.

222.    Each Distributor Defendant has an affirmative duty under federal law to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs. Federal law requires that Distributors of Schedule II drugs, including opioids, must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. §§ 823(b)(1).

223.    Federal regulations impose a non-delegable duty upon wholesale drug distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

224.    "Suspicious orders" include orders of an unusual size, orders of unusual frequency or orders deviating substantially from a normal pattern. See 21 CFR 1301.74(b). These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a wholesale distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the wholesale distributor's responsibility to report the order as suspicious. The

determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the wholesale distributor's customer base and the patterns throughout the relevant segment of the wholesale distributor industry.

225.   In addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels. See *Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007); *Masters Pharmaceutical, Inc. v. Drug Enforcement Administration*, No. 15-11355 (D.C. Cir. June 30, 2017). Regardless, all flagged orders must be reported. *Id.*

226.   These prescription drugs are regulated for the purpose of providing a "closed" system intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.[201]

227.   Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance.  Statutes and regulations define each participant's role and responsibilities.[202]

---

[201] 1970 U.S.C.C.A.N. 4566, 4571-72.

[202] Brief for Healthcare Distribution Management Association and National Association of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin.* (No.15-1335) (D.C. Cir. Apr. 4, 2016), 2016 WL 1321983, at *22 [hereinafter Brief for HDMA and NACDS].  The Healthcare Distribution Management Association (HDMA or HMA)-now known as the Healthcare Distribution Alliance (HDA)-is a national, not-for-profit trade association that represents the nation's primary, full-service healthcare distributors whose membership includes, among others: AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation. *See generally* HDA, *About*, https://www.healthcaredistribution.org/about (last visited Aug. 21, 2017). The National Association of Chain Drug Stores (NACDS) is a national, not-for-profit trade association that represents traditional drug stores and supermarkets and mass merchants with pharmacies whose membership includes, among others:  Walgreen Company, CVS Health, Rite Aid Corporation and Walmart. *See generally*  NACDS, *Mission*, https://www.nacds.org/ about/mission/ (last visited Sept. 24, 2018).

228.   As the DEA advised the Distributor Defendants in a letter to them dated September 27, 2006, wholesale distributors are "one of the key components of the distribution chain. If the closed system is to function properly, distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."[203]

229.   The Distributor Defendants have admitted that they are responsible for reporting suspicious orders.[204]

230.   The DEA sent a letter to each of the Distributor Defendants on September 27, 2006, warning that it would use its authority to revoke and suspend registrations when appropriate. The letter expressly states that a distributor, in addition to reporting suspicious orders, has a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."[205] The letter also instructs that "distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes."[206] The DEA warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."

231.   The DEA sent a second letter to each of the Distributor Defendants on December 27, 2007.[207] This letter reminds the Defendants of their statutory and

---

[203] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006) [hereinafter Rannazzisi Letter] ("This letter is being sent to every commercial entity in the United States registered with the Drug Enforcement Agency (DEA) to distribute controlled substances. The purpose of this letter is to reiterate the responsibilities of controlled substance distributors in view of the prescription drug abuse problem our nation currently faces."), *filed in Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-51.

[204] *See* Brief for HDMA and NACDS, *supra* note 202, 2016 WL 1321983, at *4 ("[R]egulations . . . in place for more than 40 years require distributors to report suspicious orders of controlled substances to DEA based on information readily available to them (e.g. a pharmacy's placement of unusually frequent or large orders).").

[205] Rannazzisi Letter, *supra* note 203, at 2

[206] *Id.* at 1.

[207] *Id.* at 2.

regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[208]   The letter further explains:

> The regulation also requires that the registrant inform the local DEA Division Office of suspicious orders <u>when discovered</u> by the registrant. Filing a monthly report of completed transactions (e.g., "excessive purchase report" or "high unity purchases") does not meet the regulatory requirement to report suspicious orders. Registrants are reminded that their responsibility does not end merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels. Reporting an order as suspicious will not absolve the registrant of responsibility if the registrant knew, or should have known, that the controlled substances were being diverted.

> The regulation specifically states that suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency. These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a registrant need not wait for a "normal pattern" to develop over time before determining whether a particular order is suspicious. The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the

---

[208] Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin, U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv- 00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8.

ordering patterns of the particular customer, but also on the patterns of the registrant's customer base and the patterns throughout the segment of the regulated industry.

Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient. This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor. Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially. Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the normal pattern of what pharmacies generally order.

When reporting an order as suspicious, registrants must be clear in their communication with DEA that the registrant is actually characterizing an order as suspicious. Daily, weekly, or monthly reports submitted by registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."

Lastly, registrants that routinely report suspicious orders, yet fill these orders without first determining that order is not being diverted into other than legitimate medical, scientific, and industrial channels, may be failing to maintain effective controls against diversion. Failure to maintain effective controls against diversion is inconsistent with the public interest as that term is used in 21 USC 823 and 824 and may result in the revocation of the registrant's DEA Certificate of Registration.209

---

[209] *Id.*

Finally, the DEA letter references the Revocation of Registration issued in Southwood Pharmaceuticals, Inc., 72 Fed. Reg. 36,487-01 (July 3, 2007), which discusses the obligation to report suspicious orders and "some criteria to use when determining whether an order is suspicious."210

232.   The Distributor Defendants admit that they "have not only statutory and regulatory responsibilities to detect and prevent diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."211

233.   The Distributor Defendants knew they were required to monitor, detect, and halt suspicious orders. Industry compliance guidelines established by the Healthcare Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers." The guidelines set forth recommended steps in the "due diligence" process, and note in particular: If an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest.212

---

210 *Id.*

211 Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc. *Cardinal Health, Inc.*, Plaintiff-Appellant, v. *U.S. Dept. Justice*, et al., Defendants-Appellees., 2012 WL 1637016, at *2 (C.A.D.C.)(hereinafter referred to as "Brief for HDMA")

212 Healthcare Distribution Management Association (HDMA) *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances*, *filed in Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B).

234.   Each of the Distributor Defendants sold prescription opioids, including hydrocodone and/or oxycodone, to retailers from which Defendants knew prescription opioids were likely to be diverted.

235.   Each Distributor Defendant owes a duty to monitor and detect suspicious orders of prescription opioids.

236.   Each Distributor Defendant owes a duty under federal law to investigate and refuse suspicious orders of prescription opioids.

237.   Each Distributor Defendant owes a duty under federal law to report suspicious orders of prescription opioids.

238.   Each Distributor Defendant owes a duty under federal law to prevent the diversion of prescription opioids into illicit markets throughout the United States.

239.   The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes and subsequent plague of opioid addiction.

240.   The foreseeable harm resulting from the diversion of prescription opioids for nonmedical purposes is abuse, addiction, morbidity and mortality and the damages caused thereby.

**2. The Distributor Defendants Breached Their Duties**

241.   Because distributors handle such large volumes of controlled substances and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on distributors to maintain effective controls to prevent diversion of controlled substances. Should a distributor deviate from these checks and balances, the closed system collapses.[213]

242.   The sheer volume of prescription opioids distributed to pharmacies in various areas, and/or to pharmacies from which the Distributor Defendants knew

---

[213] *See* Rannazzisi Decl. ¶ 10, *supra* note 208.

the opioids were likely to be diverted, was excessive for the medical need of the community and facially suspicious. Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.[214]

243.   The Distributor Defendants failed to report "suspicious orders," or which the Distributor Defendants knew was likely to be diverted, to the federal authorities, including the DEA.

244.   The Distributor Defendants unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern, and/or orders of unusual frequency, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted.

245.   The Distributor Defendants breached their duty to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted.

246.   The Distributor Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels.

247.   The Distributor Defendants breached their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the authorities including the DEA of suspicious orders when discovered, in violation of their duties under federal law.

248.   The Distributor Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific and industrial channels.[215]

---

[214] *Masters Pharmaceuticals, Inc.,* 80 Fed. Reg. 55,418-01, 55,482 (Sept. 15, 2015) (citing *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62,316, 62,322 (2012)).
[215] *See Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 206 (D.D.C. 2012).

249.   The federal laws at issue here are public safety laws.

250.   The Distributor Defendants' violations of public safety statutes constitute prima facie evidence of negligence under State law.

251.   The unlawful conduct by the Distributor Defendants is purposeful and intentional. The Distributor Defendants refuse to abide by the duties imposed by federal law which are required to legally acquire and maintain a license to distribute prescription opiates.

252.   The Distributor Defendants acted with actual malice in breaching their duties, i.e., they have acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

253.   The Distributor Defendants' repeated shipments of suspicious orders, over an extended period, in violation of public safety statutes, and without reporting the suspicious orders to the relevant authorities demonstrates wanton, willful, or reckless conduct or extreme indifference to civil obligations affecting the rights of others and justifies an award of damages.

### 3.   The Distributor Defendants Have Sought to Avoid and Have Misrepresented their Compliance with their Legal Duties

254.   The Distributor Defendants have repeatedly misrepresented their compliance with their legal duties under federal law and have wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public regarding the Distributor Defendants' compliance with their legal duties.

255.   Distributor Defendants have refused to recognize any duty beyond reporting suspicious orders. In *Masters Pharmaceuticals*, the HDMA, a trade association run by the Distributor Defendants, and the NACDS submitted amicus briefs regarding the legal duty of wholesale distributors.  Inaccurately denying the legal duties that the wholesale drug industry has been tragically recalcitrant in performing, they argued as follows:

a. The Associations complained that the "DEA has required distributors not only to report suspicious orders, but to *investigate* orders (e.g., by interrogating pharmacies and physicians) and take action to halt suspicious orders before they are filled."[216]

b. The Associations argued that, "DEA now appears to have changed its position to require that distributors not only *report* suspicious orders, but *investigate* and *halt* suspicious orders. Such a change in agency position must be accompanied by an acknowledgment of the change and a reasoned explanation for it. In other words, an agency must display awareness that it *is* changing position and show that there are good reasons for the new policy. This is especially important here, because imposing intrusive obligation on distributors threatens to disrupt patient access to needed prescription medications."[217]

c. The Associations alleged (inaccurately) that nothing "requires distributors to investigate the legitimacy of orders, or to halt shipment of any orders deemed to be suspicious."[218]

d. The Association complained that the purported "practical infeasibility of requiring distributors to investigate and halt suspicious orders (as well as report them) underscores the importance of ensuring that DEA has complied with the APA before attempting to impose such duties."[219]

e. The Associations alleged (inaccurately) that "DEA's regulations []sensibly impose[] a duty on distributors simply to report suspicious orders, but left it to DEA and its agents to investigate and halt suspicious orders."[220]

f. Also, inaccurately, the Associations argued that, "[i]mposing a duty on distributors – which lack the patient information and the necessary medical expertise - to investigate and halt orders may force

---

[216] Brief for HDMA and NACDS, *supra* note 202, 2016 WL 1321983, at *4-5.
[217] *Id.* at *8 (citations and quotation marks omitted)
[218] *Id.* at *14
[219] *Id.* at *2
[220] *Id.* at *24-25

distributors to take a shot-in-the-dark approach to complying with DEA's demands."[221]

256.   The positions taken by the trade groups are emblematic of the position taken by the Distributor Defendants in a futile attempt to deny their legal obligations to prevent diversion of the dangerous drugs.[222]

257.   The Court of Appeals for the District of Columbia recently issued its opinion affirming that a wholesale drug distributor does, in fact, have duties beyond reporting. Masters Pharm., Inc. v. Drug Enf't Admin., 861 F.3d 206 (D.C. Cir. 2017). The D.C. Circuit Court upheld the revocation of Master Pharmaceutical's license and determined that DEA regulations require that in addition to reporting suspicious orders, distributors must "decline to ship the order, or conduct some 'due diligence' and-if it is able to determine that the order is not likely to be diverted into illegal channels-ship the order." Id. at 212. Master Pharmaceutical was in violation of legal requirements because it failed to conduct necessary investigations and filled suspicious orders. Id. at 218-19, 226. A distributor's investigation must dispel all the red flags giving rise to suspicious circumstance prior to shipping a suspicious order. Id. at 226. The Circuit Court also rejected the argument made by the HDMA and NACDS (quoted above), that, allegedly, the DEA had created or imposed new duties. Id. at 220.

258.   Wholesale Distributor McKesson has recently been forced to specifically admit to breach of its duties to monitor, report, and prevent suspicious orders. Pursuant to an Administrative Memorandum of Agreement ("2017 Agreement") entered into between McKesson and the DEA in January 2017, McKesson admitted that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January 17, 2017) it "did not identify

---

[221] *Id.* at *26.
[222] *See* Brief for HDMA, *supra* note 211, 2012 WL 1637016, at *3 (arguing the wholesale distributor industry "does not know the rules of the road because" they claim (inaccurately) that the "DEA has not adequately explained them").

or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters."[223] Further, the 2017 Agreement specifically finds that McKesson "distributed controlled substances to pharmacies even though those McKesson Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R § 1306.04(a)."[224] McKesson admitted that, during this time period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations, 21 C.F.R. Part 1300 et seq., at the McKesson Distribution Centers."

259.   The 2017 Memorandum of Agreement followed a 2008 Settlement Agreement in which McKesson also admitted failure to report suspicious orders of controlled substances to the DEA.[225] In the 2008 Settlement Agreement, McKesson "recognized that it had a duty to monitor its sales of all controlled substances and report suspicious orders to DEA," but had failed to do so.[226] The 2017 Memorandum of Agreement documents that McKesson continued to breach its admitted duties by "fail[ing] to properly monitor its sales of controlled substances and/or report suspicious orders to DEA, in accordance with

---

[223] Administrative Memorandum of Agreement between the U.S. Dep't of Justice, the Drug Enf't Admin., and the McKesson Corp. (Jan. 17, 2017), https://www.justice.gov/opa/press-release/file/928476/download.
[224] *Id.* at 4.
[225] *Id.*
[226] *Id.*

McKesson's obligations."[227] As a result of these violations, McKesson was fined and required to pay to the United States $150,000,000.[228]

260.   Even though McKesson had been sanctioned in 2008 for failure to comply with its legal obligations regarding controlling diversion and reporting suspicious orders, and even though McKesson had specifically agreed in 2008 that it would no longer violate those obligations, McKesson continued to violate the laws in contrast to its written agreement not to do so.

261.   Because of the Distributor Defendants' refusal to abide by their legal obligations, the DEA has repeatedly taken administrative action to attempt to force compliance. For instance, in May 2014, the United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Divisions, reported that the DEA issued final decisions in 178 registrant actions between 2008 and 2012.[229]  The Office of Administrative Law Judges issued a recommended decision in a total of 117 registrant actions before the DEA issued its final decision, including 76 actions involving orders to show cause and 41 actions involving immediate suspension orders.[230] These actions include the following:

> a.   On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

---

[227] *Id.*; *see also* Settlement Agreement and Release between the U.S. and McKesson Corp., at 5 (Jan. 17, 2017) [hereinafter 2017 Settlement Agreement and Release] ("McKesson acknowledges that, at various times during the Covered Time Period [2009-2017], it did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 MOA."), https://www.justice.gov/opa/press-release/file/928471/download.

[228] *See* 2017 Settlement Agreement and Release, *supra* note 227, at 6.

[229] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

[230] *Id.*

**106**
**COMPLAINT**

b. On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

c. On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

d. On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

e. On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

f. On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R.§ 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

g. September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

h. On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

i. On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

j. On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150 million civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Sante Fe Springs CA, Washington Courthouse OH and West Sacramento CA.

262. Rather than abide by their non-delegable duties under public safety laws, the Distributor Defendants, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecution and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's license from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any violations of law before a suspension order can be issued.[231]

---

[231] *See* Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html?utm_term=.acdd82febb52.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html?utm_term=.1c257a985321; Eric Eyre, *DEA Agent: "We Had No Leadership" in W Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

263.   In addition to taking actions to limit regulatory prosecutions and suspensions, the Distributor Defendants undertook to deceptively convince the public that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, the Distributor Defendants attempted to assure the public they were working to curb the opioid epidemic.

264.   For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain, and represented that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[232] Given the sales volumes and the company's history of violations, this executive was either not telling the truth, or, if Cardinal Health had such a system, it ignored the results.

265.   Similarly, Defendant McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[233] Again, given McKesson's historical conduct, this statement is either false, or the company ignored outputs of the monitoring program.

266.   By misleading the public about the effectiveness of their controlled substance monitoring programs, the Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that the Plaintiffs now assert.

267.   The wrongful actions and omissions of the Distributor Defendants which have caused the diversion of opioids and which have been a substantial

---

[232] Lenny Bernstein et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job,"* Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html?utm_term=.ae3cff64bd5a
[233] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post, Dec. 22, 2016, https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html.

contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiffs' racketeering allegations below.

268.   The Distributor Defendants have abandoned their duties imposed under federal law, taken advantage of a lack of DEA law enforcement, and abused the privilege of distributing controlled substances.

### 4.   The Manufacturer Defendants' Unlawful Failure to Prevent Diversion and Monitor, Report, and Prevent Suspicious Orders

269.   The same legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescription opioids that were incumbent upon the Distributor Defendants were also legally required of the Manufacturer Defendants under federal law.

270.   Like the Distributor Defendants, the Manufacturer Defendants were required to register with the DEA to manufacture schedule II controlled substances, like prescription opioids. See 21 U.S.C. § 823(a). A requirement of such registration is the:

> maintenance of effective controls against diversion of particular controlled substances and any controlled substance in schedule I or II compounded therefrom into other than legitimate medical, scientific, research, or industrial channels, by limiting the importation and bulk manufacture of such controlled substances to a number of establishments which can produce an adequate and uninterrupted supply of these substances under adequately competitive conditions for legitimate medical, scientific, research, and industrial purposes . .

21 USCA § 823(a)(1) (emphasis added).

271.   Additionally, as "registrants" under Section 823, the Manufacturer Defendants were also required to monitor, report, and prevent suspicious orders of controlled substances:

> The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21 C.F.R. § 1301.74. See also 21 C.F.R. § 1301.02 ("Any term used in this part shall have the definition set forth in section 102 of the Act (21 U.S.C. 802) or part 1300 of this chapter."); 21 C.F.R. § 1300.01 ("Registrant means any person who is registered pursuant to either section 303 or section 1008 of the Act (21 U.S.C. 823 or 958)."  Like the Distributor Defendants, the Manufacturer Defendants breached these duties.

272.   The Manufacturer Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion. The Manufacturer Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate. After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product. Thus, the Manufacturer Defendants knew - just as the Distributor Defendants knew - the volume, frequency, and pattern of opioid orders being placed and filled. The Manufacturer Defendants built receipt of this

information into the payment structure for the opioids provided to the opioid distributors.

273.   Federal statutes and regulations are clear: just like opioid distributors, opioid manufacturers are required to "design and operate a system to disclose . . . suspicious orders of controlled substances" and to maintain "effective controls against diversion." 21 C.F.R. § 1301.74; 21 USCA § 823(a)(1).

274.   The Department of Justice has recently confirmed the suspicious order obligations clearly imposed by federal law upon opioid manufacturers, fining Mallinckrodt $35 million for failure to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements.[234]

275.   In the press release accompanying the settlement, the Department of Justice stated: Mallinckrodt did not meet its obligations to detect and notify DEA of suspicious orders of controlled substances such as oxycodone, the abuse of which is part of the current opioid epidemic. These suspicious order monitoring requirements exist to prevent excessive sales of controlled substances, like oxycodone . . . . Mallinckrodt's actions and omissions formed a link in the chain of supply that resulted in millions of oxycodone pills being sold on the street. . . . "Manufacturers and distributors have a crucial responsibility to ensure that controlled substances do not get into the wrong hands. . . ."[235]

276.   Among the allegations resolved by the settlement, the government alleged "Mallinckrodt failed to design and implement an effective system to detect and report 'suspicious orders' for controlled substances - orders that are unusual in their frequency, size, or other patterns . . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain

---

[234] Press Release, U.S. Dep't of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders.
[235] *Id.*

clinics, an increasingly excessive quantity of oxycodone pills without notifying DEA of these suspicious orders."[236]

277. The Memorandum of Agreement entered into by Mallinckrodt ("2017 Mallinckrodt MOA") avers "[a]s a registrant under the CSA, Mallinckrodt had a responsibility to maintain effective controls against diversion, including a requirement that it review and monitor these sales and report suspicious orders to DEA."[237]

278. The 2017 Mallinckrodt MOA further details the DEA's allegations regarding Mallinckrodt's failures to fulfill its legal duties as an opioid manufacturer:

> With respect to its distribution of oxycodone and hydrocodone products, Mallinckrodt's alleged failure to distribute these controlled substances in a manner authorized by its registration and Mallinckrodt's alleged failure to operate an effective suspicious order monitoring system and to report suspicious orders to the DEA when discovered as required by and in violation of 21 C.F.R. § 1301.74(b). The above includes, but is not limited to Mallinckrodt's alleged failure to:
>
> i.    conduct adequate due diligence of its customers;
> ii.   detect and report to the DEA orders of unusual size and frequency;
> iii.  detect and report to the DEA orders deviating substantially from normal patterns including, but not limited to, those identified in letters from the DEA Deputy Assistant Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007:
>    1.  orders that resulted in a disproportionate amount of substance which is most often abused going to a particular geographic region where there was known diversion;

---

[236] *Id.*

[237] Administrative Memorandum of Agreement between the United States Department of Justice, the Drug Enforcement Agency, and Mallinckrodt, plc. and its subsidiary Mallinckrodt, LLC (July 10, 2017), https://www.justice.gov/usao-edmi/press-release/file/986026/download ("2017 Mallinckrodt MOA").

       2.     orders that purchased a disproportionate amount of substance which is most often abused compared to other products; and

       3.     orders from downstream customers to distributors who were purchasing from multiple different distributors, of which Mallinckrodt was aware;

    iv.  use "chargeback" information from its distributors to evaluate suspicious orders. Chargebacks include downstream purchasing information tied to certain discounts, providing Mallinckrodt with data on buying patterns for Mallinckrodt products; and

    v.  take sufficient action to prevent recurrence of diversion by downstream customers after receiving concrete information of diversion of Mallinckrodt product by those downstream customers.[238]

279. Mallinckrodt agreed that its "system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007." Mallinckrodt further agreed that it "recognizes the importance of the prevention of diversion of the controlled substances they manufacture" and would "design and operate a system that meets the requirements of 21 CFR 1301.74(b) . . . [such that it would] utilize all available transaction information to identify suspicious orders of any Mallinckrodt product. Further, Mallinckrodt agrees to notify DEA of any diversion and/or suspicious circumstances involving any Mallinckrodt controlled substances that Mallinckrodt discovers."[239]

280. Mallinckrodt acknowledged that "[a]s part of their business model Mallinckrodt collects transaction information, referred to as chargeback data, from their direct customers (distributors). The transaction information contains data relating to the direct customer sales of controlled substances to

---

[238] 2017 Mallinckrodt MOA, *supra* note 237 at pp. 2-3.
[239] *Id.* at 3-4.

"downstream" registrants." Mallinckrodt agreed that, from this data, it would "report to the DEA when Mallinckrodt concludes that the chargeback data or other information indicates that a downstream registrant poses a risk of diversion."240

281.   The same duties imposed by federal law on Mallinckrodt were imposed upon all Distributor Defendants.

282.   The same business practices utilized by Mallinckrodt regarding "charge backs" and receipt and review of data from opioid distributors regarding orders of opioids were utilized industry-wide among opioid manufacturers and distributors, including, upon information and belief, the other Distributor Defendants.

283.   Through, inter alia, the charge back data, the Manufacturer Defendants could monitor suspicious orders of opioids.

284.   The Manufacturer Defendants failed to monitor, report, and halt suspicious orders of opioids as required by federal law.

285.   The Manufacturer Defendants' failures to monitor, report, and halt suspicious orders of opioids were intentional and unlawful.

286.   The Manufacturer Defendants have misrepresented their compliance with federal law.

287.   The wrongful actions and omissions of the Manufacturer Defendants which have caused the diversion of opioids and which have been a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiffs' racketeering allegations below.

288.   The Manufacturer Defendants' actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioids throughout the United States.

---

240 *Id.* at p. 5

**5.      Defendants' Unlawful Conduct and Breaches of Legal Duties
Caused the Harm Alleged Herein and Substantial Damages**

289.    As the Manufacturer Defendants' efforts to expand the market for opioids has increased so have the rates of prescription and sale of their products, and the rates of opioid-related substance abuse, hospitalization, and death among the people of the United States. The Distributor Defendants have continued to unlawfully ship these massive quantities of opioids.

290.    There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[241]

291.    Opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions.[242]

292.    The epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[243]

293.    The increased abuse of prescription painkillers along with growing sales has contributed to a large number of overdoses and deaths.[244]

294.    As shown above, the opioid epidemic has escalated with devastating effects: substantial opiate-related substance abuse, hospitalization and death that mirrors Defendants' increased distribution of opioids.

295.    Because of the well-established relationship between the use of prescription opioids and the use of non-prescription opioids, like heroin, the massive distribution of opioids by Defendants has caused the opioid epidemic to include heroin addiction, abuse, and death.

---

[241] *See* Dart et al., *supra* note 20.
[242] Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain-Misconceptions and Mitigation Strategies,* 374 N. Eng. J. Med. 1253 (2016).
[243] *See* Califf et al., *supra* note 23.
[244] *See*  Press Release, Ctrs. For Disease Control and Prevention, U,.S. Dep't of Health and human Servs., *supra* note 22.

296.   Defendants repeatedly and purposefully breached their duties under federal law, and such breaches are direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of prescription opioids for nonmedical purposes.

297.   The unlawful diversion of prescription opioids is a direct and proximate cause of, and/or substantial factor leading to, the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in the United States. This diversion and the epidemic are direct causes of foreseeable harms to the Plaintiffs.

298.   Defendants' unlawful conduct resulted in direct and foreseeable,  past and continuing,  economic  damages  for  which  Plaintiffs  seek  relief,  as  alleged herein, on behalf of themselves.

## CAUSES OF ACTION

### COUNT I
### RACKETEER INLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. 1961, *et seq.*
### (All Defendants)

299.   Plaintiffs reallege and incorporate by reference all preceding paragraphs and allege as follows on behalf of itself.

300.   Plaintiffs bring this Count against the following Defendants, as defined above: Purdue, Cephalon, Janssen, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (collectively, for purposes of this Count, the "RICO Defendants")

301.   The RICO Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of an association-in-fact enterprise and/or a legal   entity enterprise. At all relevant times, the RICO

Defendants were "persons" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

302.   Section 1962(c) of RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c); United States v. Turkette, 452 U.S. 576, 580 (1981).

303.   The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); Turkette, 452 U.S. at 580; Boyle v. U.S., 556 U.S. 938, 944 (2009). The definition of "enterprise" in Section 1961(4) includes legitimate and illegitimate enterprises within its scope. Specifically, the section "describes two separate categories of associations that come within the purview of an 'enterprise' -- the first encompassing organizations such as corporations, partnerships, and other 'legal entities,' and the second covering 'any union or group of individuals associated in fact although not a legal entity.'" Turkette, 452 U.S. at 577. The second category is not a more generalized description of the first. Id.

304.   For over a decade, the RICO Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, the RICO Defendants are not permitted to engage in a limitless expansion of their market through the unlawful sales of regulated painkillers. As "registrants," the RICO Defendants operated and continue to operate within the "closed-system" created under the Controlled Substances Act, 21 U.S.C. § 821, et seq. (the "CSA"). The CSA restricts the RICO Defendants' ability to manufacture or distribute Schedule II substances like opioids by

requiring them to: (1) register to manufacture or distribute opioids; (2) maintain effective controls against diversion of the controlled substances that they manufacturer or distribute; (3) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA; and (4) make sales within a limited quota set by the DEA for the overall production of Schedule II substances like opioids.

305.   The closed-system created by the CSA, including the establishment of quotas, was specifically intended to reduce or eliminate the diversion of Schedule II substances like opioids from "legitimate channels of trade" to the illicit market by controlling the quantities of the basic ingredients needed for the manufacture of [controlled substances]."245

306.   Finding it impossible to legally achieve their ever increasing sales ambitions, members of the Opioid Diversion Enterprise (as defined below) systematically and fraudulently violated their statutory duty to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the DEA of suspicious orders.246 As discussed in detail below, through the RICO Defendants' scheme, members of the Opioid Diversion Enterprise repeatedly engaged in unlawful sales of painkillers which, in turn, artificially and illegally increased the annual production quotas for opioids allowed by the DEA.247 In doing so, the RICO Defendants allowed hundreds of millions of pills to enter the illicit market which allowed them to generate significant profits.

307.   Defendants' illegal scheme was hatched by an association-in-fact enterprise between the Manufacturer Defendants and the Distributor Defendants, and executed in perfect harmony by each of them. In particular, each of the RICO

---

245 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on  International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf)
246 21 U.S.C. § 823(a)(1), (b)(1); 21 C.F.R. § 1301.74(b)-(c).
247 21 C.F.R. § 1303.11(b); 21 C.F.R. § 1303.23.

Defendants were associated with, and conducted or participated in, the affairs of the RICO enterprise (defined below and referred to collectively as the "Opioid Diversion Enterprise"), whose purpose was to engage in the unlawful sales of opioids, and deceive the public and federal and state regulators into believing that the RICO Defendants were faithfully fulfilling their statutory obligations. The RICO Defendants' scheme allowed them to make billions in unlawful sales of opioids and, in turn, increase and/or maintain high production quotas with the purpose of ensuring unlawfully increasing revenues, profits, and market share. As a direct result of the RICO Defendants' fraudulent scheme, course of conduct, and pattern of racketeering activity, they were able to extract billions of dollars of revenue from the addicted American public, while entities like the Plaintiffs experienced millions of dollars of injury caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic. As explained in detail below, the RICO Defendants' misconduct violated Section 1962(c) and  Plaintiffs are  entitled  to  treble  damages  for  their injuries under 18 U.S.C. § 1964(c).

308.   Alternatively, the RICO Defendants were members of a legal entity enterprise within the meaning of 18 U.S.C. § 1961(4), through which the RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States. Specifically, the Healthcare Distribution Alliance (the "HDA")248 is a distinct legal entity that satisfies the definition of a RICO enterprise. The HDA is a non-profit corporation formed under the laws of the District of Columbia and doing business in Virginia. As a non-profit corporation, HDA  qualifies  as  an  "enterprise"  within  the  definition  set  out  in  18 U.S.C. § 1961(4) because it is  a  corporation and a legal entity.

309.   On information and belief, each of the RICO Defendants is a member, participant, and/or sponsor of the HDA and utilized the HDA to

---

248 Health Distribution Alliance, History, Health Distribution Alliance, (last accessed on Sept. 24, 2018) https://www.healthcaredistribution.org/about/hda-history.

conduct the Opioid Diversion Enterprise and to engage in the pattern of racketeering activity that gives rise to the Count.

310.   Each of the RICO Defendants is a legal entity separate and distinct from the HDA. And, the HDA serves the interests of distributors and manufacturers beyond the RICO Defendants. Therefore, the HDA exists separately from the Opioid Diversion Enterprise, and each of the RICO Defendants exists separately from the HDA. Therefore, the HDA may serve as a RICO enterprise.

311.   The legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs were each used by the RICO Defendants to conduct the Opioid Diversion Enterprise by engaging in a pattern of racketeering activity. Therefore, the legal and association- in-fact enterprises alleged in the previous and subsequent paragraphs are pleaded in the alternative and are collectively referred to as the "Opioid Diversion Enterprise."

### The Opioid Diversion Enterprise

312.   Recognizing that there is a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970.[249] The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals.[250] Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market.[251] As reflected in comments from United States Senators during deliberation on the CSA, the "[CSA] is designed to crack down hard on the narcotics pusher and the illegal

---

[249] H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566.
[250] *Id.*
[251] *Gonzalez v. Raich*, 545 U.S. 1, 12-14 (2005); 21 U.S.C. § 801(20; 21 U.S.C. §§ 821-824, 827, 880; U.S.C. §§ 821-824, 827, 880; H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572 (Sept. 10, 1970).

diverters of pep pills and goof balls."[252] Congress was concerned with the diversion of drugs out of legitimate channels of distribution when it enacted the CSA and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market."[253] Moreover, the closed-system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain.[254] All registrants, manufacturers and distributors alike, must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion.[255] When registrants at any level fail to fulfill their obligations, the necessary checks and balances collapse.[256] The result is the scourge of addiction that has occurred.

313.   In 2006 and 2007, the DEA issued multiple letters to the Distributor Defendants reminding them of their obligation to maintain effective controls against diversion of particular controlled substances, design and operate a system to disclose suspicious orders, and to inform the DEA of any suspicious orders.[257] The DEA also published suggested questions that a distributor should ask prior to shipping controlled substances, in order to "know their customers."[258] Central to the closed-system created by the CSA was the directive that the DEA determine quotas of each basic class of Schedule I and II controlled substances

---

[252] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566; 116 Cong. Rec. 977-78 (Comments of Sen. Dodd, Jan 23, 1970).

[253] *See* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

[254] See Statement of Joseph T. Rannazzisi before the Caucus on International Narcotics Control United States Senate, July 18, 2012 (available athttps://www.justice.gov/sites/default/files/testimonies/witnesses/attachments/07/18/12/07-18-12-dea-rannazzisi.pdf).

[255] *Id.*

[256] Joseph T. Rannazzisi Decl. at 10, *supra* note 208.

[257] Joseph T. Rannazzisi, In Reference to Registration # RC0183080 (September 27, 2006); Joseph T..Rannazzisi, In Reference to Registration # RC0183080 (December 27, 2007).

[258] Suggested Questions a Distributor should ask prior to shipping controlled substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf).

each year. The quota system was intended to reduce or eliminate diversion from "legitimate channels of trade" by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled substances], and the requirement of order forms for all transfers of these drugs."[259] When evaluating production quotas, the DEA was instructed to consider the following information:

a. Information provided by the Department of Health and Human Services;

b. Total net disposal of the basic class by all manufacturers;

c. Trends in the national rate of disposal of the basic class;

d. An applicant's production cycle and current inventory position;

e. Total actual or estimated inventories of the class and of all substances manufactured from the class and trends in inventory accumulation; and

f. Other factors such as: changes in the currently accepted medical use of substances manufactured for a basic class; the economic and physical availability of raw materials; yield and substantially issues; potential disruptions to production; and unforeseen emergencies.[260]

314.  It is unlawful for a registrant to manufacture a controlled substance in Schedule II, like prescription opioids, that is (1) not expressly authorized by its registration and by a quota assigned to it by DEA, or (2) in excess of a quota assigned to it by the DEA.[261]

315.  At all relevant times, the RICO Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing

---

[259] 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi, *supra* note 253.

[260] See Testimony of Joseph T. Rannazzisi *supra* note 253.

[261] *Id.* (citing 21 U.S.C. 842(b)).

sales, revenues and profits by disregarding their statutory duty to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs into the illicit market, in order to unlawfully increase the quotas set by the DEA and allow them to collectively benefit from the unlawful formation of a greater pool of prescription opioids from which to profit. The RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States through this enterprise.

316.  The opioid epidemic has its origins in the mid-1990s when, between 1997 and 2007, per capita purchase of methadone, hydrocodone, and oxycodone increased 13-fold, 4-fold, and 9-fold, respectively. By 2010, enough prescription opioids were sold in the United States to medicate every adult in the county with a dose of 5 milligrams of hydrocodone every four hours for one month.[262] On information and belief, the Opioid Diversion Enterprise has been ongoing for at least the last decade.[263]

317.  The Opioid Diversion Enterprise was and is a shockingly successful endeavor. The Opioid Diversion Enterprise has been conducting business uninterrupted since its genesis, but, it was not until recently that the United States and State regulators finally began to unravel the extent of the enterprise and the toll that it exacted on the American public.

318.  At all relevant times, the Opioid Diversion Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the RICO Defendants; (d) characterized by interpersonal relationships among the RICO Defendants; (e) had sufficient

---

[262] Keyes KM, et al., *supra* note 21.

[263] Matthew Perrone, Pro-Painkiller echo chamber shaped policy amid drug epidemic, The Center for Public Integrity (last accessed March 9, 2018.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic

longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. *Turkette*, 452 U.S. at 580; *Boyle*, 556 U.S. at 944 (2009). Each member of the Opioid Diversion Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid sales generated as a result of the Opioid Diversion Enterprise's disregard for their duty to prevent diversion of their drugs into the illicit market and then requesting the DEA increase production quotas, all so that the RICO Defendants would have a larger pool of prescription opioids from which to profit.

319.   The Opioid Diversion Enterprise also engaged in efforts to lobby against the DEA's authority to hold the RICO Defendants liable for disregarding their duty to prevent diversion. Members of the Pain Care Forum (described in greater detail below) and the Healthcare Distribution Alliance lobbied for the passage of legislation to weaken the DEA's enforcement authority. The Ensuring Patient Access and Effective Drug Enforcement Act significantly reduced the DEA's ability to issue orders to show cause and to suspend and/or revoke registrations[264] The HDA and other members of the Pain Care Forum contributed substantial amounts of money to political campaigns for federal candidates, state candidates, political action committees and political parties. Plaintiff is informed and believes that the Pain Care Forum and their members poured at least $3.5 million into lobbying efforts in this jurisdiction while the HDA devoted over a million dollars a year to its lobbying efforts between 2011 and 2016.

---

[264] *See* <u>HDMA is now the Healthcare Distribution Alliance,</u> Pharmaceutical Commerce, (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/; Lenny Bernstein & Scott Higham, *supra* note 231; Lenny Bernstein & Scott Higham, *supra* note 231; Eric Eyre, *supra* note 231.

320.   The Opioid Diversion Enterprise functioned by selling prescription opioids. While there are some legitimate uses and/or needs for prescription opioids, the RICO Defendants, through their illegal enterprise, engaged in a pattern of racketeering activity that involves a fraudulent scheme to increase revenue by violating State and Federal laws requiring the maintenance of effective controls against diversion of prescription opioids, and the identification, investigation, and reporting of suspicious orders of prescription opioids destined for the illicit drug market. The goal of Defendants' scheme was to increase profits from opioid sales. But, Defendants' profits were limited by the production quotas set by the DEA, so the Defendants refused to identify, investigate and/or report suspicious orders of their prescription opioids being diverted into the illicit drug market. The end result of this strategy was to increase and maintain artificially high production quotas of opioids so that there was a larger pool of opioids for Defendants to manufacture and distribute for public consumption.

321.   The Opioid Diversion Enterprise engaged in, and its activities affected, interstate and foreign commerce because the enterprise involved commercial activities across states lines, such as manufacture, sale, distribution, and shipment of prescription opioids throughout the country and this jurisdiction, and the corresponding payment and/or receipt of money from the sale of the same.

322.   Within the Opioid Diversion Enterprise, there were interpersonal relationships and common communication by which the RICO Defendants shared information on a regular basis. These interpersonal relationships also formed the organization of the Opioid Diversion Enterprise. The Opioid Diversion Enterprise used their interpersonal relationships and communication network for the purpose of conducting the enterprise through a pattern of racketeering activity.

323.   Each of the RICO Defendants had a systematic link to each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities. The RICO Defendants participated in the operation and management of the Opioid Diversion Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they each have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

324.   The RICO Defendants exerted substantial control over the Opioid Diversion Enterprise by their membership in the Pain Care Forum, the HDA, and through their contractual relationships.

325.   The Pain Care Forum ("PCF") has been described as a coalition of drug makers, trade groups and dozens of non-profit organizations supported by industry funding. The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

326.   The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drug makers and their allies shaped the national response to the ongoing wave of prescription opioid abuse."[265]   Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[266]

327.   Not surprisingly, each of the RICO Defendants who stood to profit from lobbying in favor of prescription opioid use is a member of and/or

---

[265] Matthew Perrone, *supra* note 263.
[266] *Id.*

participant in the PCF.[267] In 2012, membership and participating organizations included the HDA (of which all RICO Defendants are members), Endo, Purdue, Johnson & Johnson (the parent company for Janssen Pharmaceuticals), Actavis (*i.e.*, Allergan), and Teva (the parent company of Cephalon)[268]. Each of the Manufacturer Defendants worked together through the PCF to advance the interests of the enterprise. But, the Manufacturer Defendants were not alone. The Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA.[269] Plaintiff is informed and believes that the Distributor Defendants participated directly in the PCF as well.

328.   The 2012 Meeting Schedule for the Pain Care Forum is particularly revealing on the subject of the Defendants' interpersonal relationships. The meeting schedule indicates that meetings were held in the D.C. office of Powers Pyles Sutter & Verville on a monthly basis, unless otherwise noted. Local members were "encouraged to attend in person" at the monthly meetings. And, the meeting schedule indicates that the quarterly and year-end meetings included a "Guest Speaker."

329.   The 2012 Pain Care Forum Meeting Schedule demonstrates that each of the Defendants participated in meetings on a monthly basis, either directly or through their trade organization, in a coalition of drug makers and their allies whose sole purpose was to shape the national response to the ongoing prescription opioid epidemic, including the concerted lobbying efforts that the PCF undertook on behalf of its members.

---

[267] Pain Care Forum   2012   Meetings   Schedule,   (last   updated   December   2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings-Schedule-amp.pdf
[268] *Id*. Plaintiff are informed and believes that Mallinckrodt became an active member of the PCF sometime after 2012.
[269] *Id*. The Executive Committee of the HDA (formerly the HDMA) currently includes the Chief Executive Officer, Pharmaceutical Segment for Cardinal Health, Inc., the Group President, Pharmaceutical Distribution and Strategic Global Source for AmerisourceBergen Corporation, and the President, U.S. Pharmaceutical for McKesson Corporation. Executive Committee, Healthcare (last accessed on Sept. 24, 2018), https://www.healthcaredistribution.org/about/executive-committee.

330.   Second, the HDA - or Healthcare Distribution Alliance - led to the formation of interpersonal relationships and an organization between the RICO Defendants. Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and the Manufacturer Defendants named in the Complaint, including Actavis (*i.e.*, Allergan), Endo, Purdue, Mallinckrodt and Cephalon were members of the HDD.[270] And, the HDA and each of the Distributor Defendants, eagerly sought the active membership and participation of the Manufacturer Defendants by advocating that one of the benefits of membership included the ability to develop direct relationships between Manufacturers and Distributors at high executive levels.

331.   In fact, the HDA touted the benefits of membership to the Manufacturer Defendants, advocating that membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."[271] Clearly, the HDD and the Distributor Defendants believed that membership in the HDA was an opportunity to create interpersonal and ongoing organizational relationships between the Manufacturers and Defendants.

332.   The application for manufacturer membership in the HDA further indicates the level of connection that existed between the RICO Defendants.[272] The manufacturer membership application must be signed by a "senior company executive," and it requests that the manufacturer applicant identify a key contact and any additional contacts from within its company. The HDA application also

---

[270] Manufacturer  Membership, Healthcare Distribution Alliance, (accessed on Sept. 24, 2018), https://www.healthcaredistribution.org/about/membership/manufacturer.
[271] Manufacturer  Membership Benefits, Healthcare Distribution Alliance,  (accessed on Sept. 24, 2018) https://www.hda.org/~/media/pdfs/membership/manufacturer-membership-benefits.ashx?la=en
[272] Manufacturer  Membership,  *supra* note 270.

requests that the manufacturer identify its current distribution information and its most recent year end net sales through any HDA distributors, including but not limited to, Defendants AmerisourceBergen, Cardinal Health, and McKesson.[273]

333.   After becoming members, the Distributors and Manufacturers were eligible to participate on councils, committees, task forces and working groups, including:

> g.   Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."[274]
>
> h.   Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions. The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e-commerce." Participation in this committee includes distributors and manufacturer members.[275]
>
> i.   Health, Beauty and Wellness Committee: "This committee conducts research, as well as creates and exchanges industry knowledge to help shape the future of the distribution for health, beauty and wellness/consumer products in the healthcare supply chain." Participation in this committee includes distributors and manufacturer members.[276]
>
> j.   Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within

---

[273] *Id.*
[274] Councils and Committees, Healthcare Distribution Alliance, (accessed on Sept. 24, 2018), https://www.healthcaredistribution.org/about/councils-and-committees.
[275] *Id.*
[276] *Id.*

the healthcare supply chain. Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement." Participation in this committee includes distributors and manufacturer members.[277]

k. Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel. Topics discussed include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members.[278]

l. Bar Code Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.[279]

m. eCommerce Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.[280]

n. ASN Working Group: Participation includes Distributor, Manufacturer and Service Provider Members.[281]

334. Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation includes Distributor and Manufacturer Members.[282]

---

[277] *Id.*
[278] *Id.*
[279] *Id.*
[280] *Id.*
[281] *Id.*
[282] *Id.*

335.  The councils, committees, task forces and working groups provided the Manufacturer and Distributor Defendants with the opportunity to work closely together in shaping their common goals and forming the enterprise's organization.

336.  The HDA also offers a multitude of conferences, including annual business and leadership conferences. The HDA, and the Distributor Defendants advertise these conferences to the Manufacturer Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[283] The conferences also gave the Manufacturer and Distributor Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[284] The HDA and its conferences were significant opportunities for the Manufacturer and Distributor Defendants to interact at a high-level of leadership. And, it is clear that the Manufacturer Defendants embraced this opportunity by attending and sponsoring these events.[285]

337.  Third, the RICO Defendants maintained their interpersonal relationships by working together and exchanging information and driving the unlawful sales of their opioids through their contractual relationships, including chargebacks and vault security programs.

338.  The Manufacturer Defendants engaged in an industry-wide practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids.[286] As reported in the Washington Post, identified

---

[283] Business and Leadership Conference - Information for Manufacturers, Healthcare Distribution Alliance, (accessed on Sept. 14, 2017), https://www.healthcaredistribution.org/events/2015-business-and-leadership-conference/blc-for-manufacturers.
[284] *Id.*
[285] 2015 Distribution Management Conference and Expo, Healthcare Distribution Alliance, (accessed on Sept. 14, 2017) https://healthcaredistribution.org/events/2015-distribution-management-conference.
[286] Lenny Bernstein & Scott Higham, The government's struggle to hold opioid manufacturers accountable, The Washington Post, (April 2, 2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.b24cc81cc356; *see also*, Letter from Sen. Claire McCaskill, (July 27, 2017),

by Senator McCaskill, and acknowledged by the HDA, there is an industry-wide practice whereby the Manufacturers paid the Distributors rebates and/or chargebacks on their prescription opioid sales.[287] On information and belief, these contracts were negotiated at the highest levels, demonstrating ongoing relationships between the Manufacturer and Distributor Defendants. In return for the rebates and chargebacks, the Distributor Defendants provided the Manufacturer Defendants with detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices.[288] The Manufacturer Defendants used this information to gather high-level data regarding overall distribution and direct the Distributor Defendants on how to most effectively sell the prescription opioids.

339.   The contractual relationships among the RICO Defendants also include vault security programs. The RICO Defendants are required to maintain certain security protocols and storage facilities for the manufacture and distribution of their opiates. Plaintiffs are informed and believe that manufacturers negotiated agreements whereby the Manufacturers installed security vaults for Distributors in exchange for agreements to maintain minimum sales performance thresholds. Plaintiffs are informed and believe that these agreements were used by the RICO Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements.

340.   Taken together, the interaction and length of the relationships between and among the Manufacturer and Distributor Defendants reflects a deep level of interaction and cooperation between two groups in a tightly knit

---

https://www.hsgac.senate.gov/imo/media/doc/2017-07-26%20CMC%20requests%20to%20Mallinckrodt,%20Teva,%20Endo,%20and%20Allergan.pdf; Letters From Sen. Claire McCaskill, (March 28, 2017), https://www.mccaskill.senate.gov/opioid-investigation; Purdue Managed Markets, Purdue Pharma, (accessed on Sept. 24, 2018), http://www.purduepharma.com/payers/managed-markets/.
[287] Id.
[288] Webinars, Healthcare Distribution Alliance, (last accessed on Sept. 24, 2018), https://www.hda.org/resources/webinar-leveraging-edi-and-asn-for-dscsa

industry. The Manufacturer and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The RICO Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids. The HDA and the Pain Care Forum are but two examples of the overlapping relationships and concerted joint efforts to accomplish common goals and demonstrates that the leaders of each of the RICO Defendants was in communication and cooperation.

341.   According to articles published by the Center for Public Integrity and The Associated Press, the Pain Care Forum, whose members include the Manufacturers and the Distributors' trade association, has been lobbying on behalf of the Manufacturers and Distributors for "more than a decade."[289] And, from 2006 to 2016 the Distributors and Manufacturers worked together through the Pain Care Forum to spend over $740 million lobbying in the nation's capital and in all 50 statehouses on issues including opioid-related measures.[290] Similarly, the HDA has continued its work on behalf of Distributors and Manufacturers, without interruption, since at least 200, if not longer.[291]

342.   As described above, the RICO Defendants began working together as early as 2006 through the Pain Care Forum and/or the HDA to promote the common purpose of their enterprise. Plaintiffs are informed and believe that the RICO Defendants worked together as an ongoing and continuous organization throughout the existence of their enterprise.

## Conduct of the Opioid Diversion Enterprise

343.   During the time period alleged in this Complaint, the RICO Defendants exerted control over, conducted and/or participated in the Opioid

---

[289] Matthew Perrone, *supra* note 263.
[290] *Id.*
[291] HDA History, Healthcare Distribution Alliance, (accessed on Sept. 24, 2018) https://healthcaredistribution.org/about/hda-history.

Diversion Enterprise by failing to comply with their Federal and State obligations to identify, investigate and report suspicious orders of opioids in order to prevent diversion of those highly addictive substances into the illicit market, to halt such unlawful sales and, in doing so, to increase production quotas and generate unlawful profits, as follows:

344.   Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to maintain effective controls against diversion of their prescription opioids.

345.   Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids.

346.   Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids.

347.   Defendants paid nearly $800 million dollars to influence local, state and federal governments through joint lobbying efforts as part of the Pain Care Forum. The RICO Defendants were all members of their Pain Care Forum either directly or indirectly through the HDA. The lobbying efforts of the Pain Care Forum and its members, included efforts to pass legislation making it more difficult for the DEA to suspend and/or revoke the Manufacturers' and Distributors' registrations for failure to report suspicious orders of opioids.

348.   The RICO Defendants exercised control and influence over the distribution industry by participating and maintaining membership in the HDA.

349.   The RICO Defendants applied political and other pressure on the DOJ and DEA to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied Congress to strip the DEA of its ability to

immediately suspend registrations pending investigation by passing the "Ensuring Patient Access and Effective Drug Enforcement Act."[292]

350.   The RICO Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales. Plaintiffs are informed and believe that the Manufacturer Defendants used the chargeback program to acquire detailed high-level data regarding sales of the opioids they manufactured. And, Plaintiffs are informed and believe that the Manufacturer Defendants used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger volumes.

351.   The Manufacturer Defendants lobbied the DEA to increase Aggregate Production Quotas, year after year by submitting net disposal information that the Manufacturer Defendants knew included sales that were suspicious and involved the diversion of opioids that had not been properly investigated or reported by the RICO Defendants.

352.   The Distributor Defendants developed "know your customer" questionnaires and files. This information, compiled pursuant to comments from the DEA in 2006 and 2007 was intended to help the RICO Defendants identify suspicious orders or customers who were likely to divert prescription opioids.[293] On information and belief, the "know your customer" questionnaires informed the RICO Defendants of the number of pills that the pharmacies sold, how many non-controlled substances are sold compared to controlled

---

[292] *See* HDMA is now the Healthcare Distribution Alliance, Pharmaceutical Commerce, *supra* note 264; Lenny Bernstein & Scott Higham, *supra* note 231; Lenny Bernstein& Scott Higham, *supra* note 231; Eric Eyre, *supra* note 231.

[293] Suggested Questions a Distributor should ask prior to shipping controlled substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf).; Richard Widup,Jr., Kathleen H. Dooley, Esq. Pharmaceutical Production Diversion: Beyond the PDMA, Purdue Pharma and McQuite Woods LLC, (available at https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf).

substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

353.   The RICO Defendants refused to identify, investigate and report suspicious orders to the DEA when they became aware of the same despite their actual knowledge of drug diversion rings. The RICO Defendants refused to identify suspicious orders and diverted drugs despite the DEA issuing final decisions against the Distributor Defendants in 178 registrant actions between 2008 and 2012[294] and 117 recommended decisions in registrant actions from The Office of Administrative Law Judges. These numbers include 76 actions involving orders to show cause and 41 actions involving immediate suspension orders - all for failure to report suspicious orders.[295]

354.   Defendants' scheme had decision-making structure that was driven by the Manufacturer Defendants and corroborated by the Distributor Defendants. The Manufacturer Defendants worked together to control the State and Federal Government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion and identify suspicious orders and report them to the DEA.

355.   The RICO Defendants worked together to control the flow of information and influence state and federal governments and political candidates to pass legislation that was pro-opioid. The Manufacturer and Distributor Defendants did this through their participation in the Pain Care Forum and Healthcare Distributors Alliance.

---

[294] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.
[295] *Id.*

356.   The RICO Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas and Procurement Quotas allowed by the DEA stayed high and ensured that suspicious orders were not reported to the DEA. By not reporting suspicious orders or diversion of prescription opioids, the RICO Defendants ensured that the DEA had no basis for refusing to increase or decrease the production quotas for prescription opioids due to diversion of suspicious orders. The RICO Defendants influenced the DEA production quotas in the following ways:

o.   The Distributor Defendants assisted the enterprise and the Manufacturer Defendants in their lobbying efforts through the Pain Care Forum;

p.   The Distributor Defendants invited the participation, oversight and control of the Manufacturer Defendants by including them in the HDA, including on the councils, committees, task forces, and working groups;

q.   The Distributor Defendants provided sales information to the Manufacturer Defendants regarding their prescription opioids, including reports of all opioids prescriptions filled by the Distributor Defendants;

r.   The Manufacturer Defendants used a chargeback program to ensure delivery of the Distributor Defendants' sales information;

s.   The Manufacturer Defendants obtained sales information from QuintilesIMS (formerly IMS Health) that gave them a "stream of data showing how individual doctors across the nation were prescribing opioids";[296]

---

[296] Harriet Ryan, et al., More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew, Los Angeles Times, http://www.latimes.com/projects/la-me-oxycontin-part2/

t.  The Distributor Defendants accepted rebates and chargebacks for orders of prescription opioids;

u.  The Manufacturer Defendants used the Distributor Defendants' sales information and the data from QuintilesIMS to instruct the Distributor Defendants to focus their distribution efforts to specific areas where the purchase of prescription opioids was most frequent;

v.  The RICO Defendants identified suspicious orders of prescription opioids and then continued filling those unlawful orders, without reporting them, knowing that they were suspicious and/or being diverted into the illicit drug market;

w.  The RICO Defendants refused to report suspicious orders of prescription opioids despite repeated investigation and punishment of the Distributor Defendants by the DEA for failure to report suspicious orders; and

x.  The RICO Defendants withheld information regarding suspicious orders and illicit diversion from the DEA because it would have revealed that the "medical need" for and the net disposal of their drugs did not justify the production quotas set by the DEA.

357.  The scheme devised and implemented by the RICO Defendants amounted to a common course of conduct characterized by a refusal to maintain effective controls against diversion, and all designed and operated to ensure the continued unlawful sale of controlled substances.

### Pattern of Racketeering Activity

358.  The Rico Defendants conducted and participated in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(B), including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343); and 18 § 1961(D) by the manufacture,

importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

359.   The RICO Defendants carried out, or attempted to carry out, a scheme to defraud federal and state regulators, and the American public by knowingly conducting or participating in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

360.   The RICO Defendants committed, conspired to commit, and/or or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the RICO Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Diversion Enterprise. The RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

361.   The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions regarding their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

362.   In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

363.   The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

y.   Mail Fraud: The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

z.   Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, and misrepresentations, promises, and omissions.

364.   The RICO Defendants' use of the mail and wires includes, but is not limited to, the transmission, delivery, or shipment of the following by the Manufacturers, Distributors, or third parties that were foreseeably caused to be sent as a result of the RICO Defendants' illegal scheme, including but not limited to:

aa.   The prescription opioids themselves;

bb.   Documents and communications that facilitated the manufacture, purchase and unlawful sale of prescription opioids;

cc. Defendants' DEA registrations;

dd. Documents and communications that supported and/or facilitated Defendants' DEA registrations;

ee. Documents and communications that supported and/or facilitated the Defendants' request for higher aggregate production quotas, individual production quotas, and procurement quotas;

ff. Defendants' records and reports that were required to be submitted to the DEA pursuant to 21 U.S.C. § 827;

gg. Documents and communications related to the Defendants' DEA reports pursuant to 21 U.S.C. § 823 and 21 C.F.R. § 1301.74

hh. Documents intended to facilitate the manufacture and distribution of Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports and correspondence;

ii. Documents for processing and receiving payment for prescription opioids;

jj. Payments from the Distributors to the Manufacturers;

kk. Rebates and chargebacks from the Manufacturers to the Distributors;

ll. Payments to Defendants' lobbyists through the Pain Care Forum;

mm.     Payments to Defendants' trade organizations, like the HAD, for memberships and/or sponsorships;

nn. Deposits of proceeds from Defendants' manufacturer and distribution of prescription opioids; and

oo. Other documents and things, including electronic communications.

365.  On information and belief, the RICO Defendants (and/or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of prescription opioids and related documents by mail or by private carrier affecting interstate commerce, including the following:

366.  Purdue manufactures multiple forms of prescription opioids, including but not limited to: OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER. Purdue manufactured and shipped these prescription opioids to the Distributor Defendants.

367.  The Distributor Defendants shipped Purdue's prescription opioids throughout the United States.

368.  Cephalon manufacturers multiple forms of prescription opioids, including but not limited to: Actiq and Fentora. Cephalon manufactured and shipped these prescription opioids to the Distributor Defendants.

369.  The Distributor Defendants shipped Teva's prescription opioids throughout the United States.

370.  Janssen manufactures prescription opioids known as Duragesic. Janssen manufactured and shipped its prescription opioids to the Distributor Defendants.

371.  The Distributor Defendants shipped Janssen's prescription opioids throughout the United States.

372.  Endo manufactures multiple forms of prescription opioids, including but not limited to: Opana/Opana ER, Percodan, Percocet, and Zydone. Endo manufactured and shipped its prescription opioids to the Distributor Defendants.

373.  The Distributor Defendants shipped Endo's prescription opioids throughout the United States.

374.  Actavis manufactures multiple forms of prescription opioids, including but not limited to: Kadin and Norco, as well as generic versions of

the drugs known as Kadian, Duragesic and Opana. Actavis manufactured and shipped its prescription opioids to the Distributor Defendants.

375.   The Distributor Defendants shipped Actavis' prescription opioids throughout the United States.

376.   Mallinckrodt manufactures multiple forms of prescription opioids, including but not limited to Exalgo and Roxicodone.

377.   The Distributor Defendants shipped Mallinckrodt's prescription opioids throughout the United States.

378.   The RICO Defendants also used the internet and other electronic facilities to carry out their scheme and conceal the ongoing fraudulent activities. Specifically, the RICO Defendants made misrepresentations about their compliance with Federal and State laws requiring them to identify, investigate and report suspicious orders of prescription opioids and/or diversion of the same into the illicit market.

379.   At the same time, the RICO Defendants misrepresented the superior safety features of their order monitoring programs, ability to detect suspicious orders, commitment to preventing diversion of prescription opioids and that they complied with all state and federal regulations regarding the identification and reporting of suspicious orders of prescription opioids.

380.   Plaintiffs are also informed and believe that the RICO Defendants utilized the internet and other electronic resources to exchange communications, to exchange information regarding prescription opioid sales, and to transmit payments and rebates/chargebacks.

381.   The RICO Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail and with various other affiliates, regional offices, regulators, distributors, and other third-party entities in furtherance of the scheme.

382. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and the public that Defendants were complying with their state and federal obligations to identify and report suspicious orders of prescription opioids all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market. The RICO Defendants' scheme and common course of conduct was intended to increase or maintain high production quotas for their prescription opioids from which they could profit.

383. Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records. But, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

384. The RICO Defendants did not undertake the practices described herein in isolation, but as part of a common scheme. These actions violate 18 U.S.C. § 1962(c). Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, may have contributed to and/or participated in the scheme with the RICO Defendants in these offenses and have performed acts in furtherance of the scheme to increase revenues, increase market share, and /or minimize the losses for the RICO Defendants.

385. The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

386.   The RICO Defendants hid from the general public, and suppressed and/or ignored warnings from third parties, whistleblowers and governmental entities, about the reality of the suspicious orders that the RICO Defendants were filling on a daily basis, leading to the diversion of a tens of millions of doses of prescription opioids into the illicit market.

387.   The RICO Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing and distributing prescription opioids.

388.   Indeed, for the Defendants' fraudulent scheme to work, each of the Defendants had to agree to implement similar tactics regarding marketing prescription opioids and refusing to report suspicious orders.

389.   As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

390.   The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants while Plaintiff was left with substantial monetary losses through the damage that the prescription opioid epidemic caused. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Opioid Diversion Enterprise and in furtherance of its fraudulent scheme.

391.   The pattern of racketeering activity alleged herein and the Opioid Diversion Enterprise are separate and distinct from each other. Likewise, Defendants are distinct from the enterprise.

392.   The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future.

393.   Many of the precise dates of the RICO Defendants' improper actions at issue here have been hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioids Addiction and Opioid Diversion Enterprise alleged herein depended upon secrecy.

394.   Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including the Plaintiffs. Defendants calculated and intentionally crafted the Opioid Diversion Enterprise and their scheme to increase and maintain their increased profits, without regard to the effect such behavior would have on consumers and the Plaintiffs. In designing and implementing the scheme, at all times Defendants were cognizant of the fact that those in the manufacturing and distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and reliable information regarding Defendants' products and their manufacture and distribution of those products.

395.   By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

396.   It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations, would harm Plaintiff as set out herein, by allowing the flow of prescription opioids from appropriate medical channels into the illicit drug market.

397.   The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

**The RICO Defendants Manufactured, Sold and/or Dealt in Controlled Substances**

398.   The RICO Defendants conducted and participated in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(D) by the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

399.   The RICO Defendants improper actions are punishable under the laws of the United States. Specifically, 21 U.S.C. § 483(a)(4) makes it unlawful for any person to knowingly or intentionally furnish false or fraudulent information in, or omit any material information from, any application, report, record or other document required to be made, kept or filed under this subchapter.

400.   Each of the RICO Defendants qualify as registrants under the CSA. Their status as registrants under the CSA requires that they maintain effective controls against diversion of controlled substances in schedule I or II, design and operate a system to disclose to the registrant suspicious orders of controlled substances and inform the DEA of suspicious orders when discovered by the registrant. 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

401.   Pursuant to the CSA and the Code of Federal Regulations, the RICO Defendants were required to make reports to the DEA of any suspicious orders identified through the design and operation of their system to disclose suspicious orders.

402.   The RICO Defendants knowingly and intentionally furnished false or fraudulent information in their reports to the DEA about suspicious orders, and/or omitted material information from reports, records and other document required to be filed with the DEA including the Manufacturer Defendants' applications for production quotas. Specifically, the RICO Defendants were

…

aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market and failed to report this information to the DEA in their mandatory reports and their applications for production quotas.

403.   For example, The DEA and DOJ began investigating McKesson in 2013 regarding its monitoring and reporting of suspicious controlled substances orders. On April 23, 2015, McKesson filed a Form-8-K announcing a settlement with the DEA and DOJ wherein it admitted to violating the CSA and agreed to pay $150 million and have some of its DEA registrations suspended on a staggered basis. The settlement was finalized on January 17, 2017.[297]

404.   Purdue's experience in Los Angeles is another striking example of Defendants' willful violation of the CSA and Code of Federal Regulations as it relates to reporting suspicious orders of prescription opioids. In 2016, the Los Angeles Times reported that Purdue was aware of a pill mill operating out of Los Angeles yet failed to alert the DEA.[298] The LA Times uncovered that Purdue began tracking a surge in prescriptions in Los Angeles, including one prescriber in particular. A Purdue sales manager spoke with company officials in 2009 about the prescriber, asking "Shouldn't the DEA be contacted about this?" and adding that she felt "very certain this is an organized drug ring."[299] Despite knowledge of the staggering amount of pills being issued in Los Angeles, and internal discussion of the problem, "Purdue did not shut off the supply of highly addictive OxyContin and did not tell authorities what it knew about Lake Medical until several years later when the clinic was out of business and its leaders indicted. By that time, 1.1 million pills had spilled into the hands of Armenian mobsters, the Crips gang and other criminals."[300]

---

[297] McKesson, McKesson Finalizes Settlement with U.S. Department of Justice and U.S. Drug Enforcement Administration to Resolve Past Claims, (January 17, 2017), http://www.mckesson.com/about-mckesson/newsroom/press- releases/2017/mckesson-finalizes-settlement-with-doj- and-dea-to-resolve-past-claims/.
[298] Harriet Ryan, et al., *spura* note 296.
[299] Id.
[300] Id.

405.   Finally, Mallinckrodt was recently the subject of a DEA and Senate investigation for its opioid practices. Specifically, in 2011, the DEA targeted Mallinckrodt arguing that it ignored its responsibility to report suspicious orders as 500 million of its pills ended up in Florida between 2008 and 2012.[301] After six years of DEA investigation, Mallinckrodt agreed to a settlement involving a $35 million fine. Federal prosecutors summarized the case by saying that Mallinckrodt's response was that everyone knew what was going on in Florida but they had no duty to report it.[302]

406.   Plaintiff is informed and believes that the foregoing examples reflect the RICO Defendants' pattern and practice of willfully and intentionally omitting information from their mandatory reports to the DEA as required by 21 C.F.R. § 1301.74. This conclusion is supported by the sheer volume of enforcement actions available in the public record against the Distributor Defendants.[303] For instance:

pp. On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

qq. On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

rr. On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland,

---

[301] Lenny Bernstein & Scott Higham, The government's struggle to hold opioid manufacturers accountable, *supra* note 231.
[302] *Id.*
[303] Evaluation and Inspections Div., *supra* note 294.

Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

ss. On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

tt. On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

uu. On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

vv. On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

ww.   On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

xx. On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

yy. On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Santa Fe Springs CA, Washington Courthouse OH and West Sacramento CA.

407. These actions against the Distributor Defendants confirm that the Distributors knew they had a duty to maintain effective controls against diversion, design and operate a system to disclose suspicious orders, and to report suspicious orders to the DEA. These actions also demonstrate, on information and belief, that the Manufacturer Defendants were aware of the enforcement against their Distributors and the diversion of the prescription opioids and a corresponding duty to report suspicious orders.

408. The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future.

409. Many of the precise dates of Defendants' improper actions at issue herein were hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioid Diversion Enterprise depended upon the secrecy of the participants in that enterprise.

410. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers and Plaintiffs. Defendants calculated and intentionally crafted the

diversion scheme to increase and maintain profits from unlawful sales of opioids, without regard to the effect such behavior would have on consumers and Plaintiffs.

411.  By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

412.  It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations would harm Plaintiffs as set out herein by allowing the flow of prescription opioids from appropriate medical channels into the illicit drug market.

413.  The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

### Damages

414.  The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs' injuries in its businesses, as described above in language expressly incorporated herein by reference.

415.  Plaintiffs' injuries were proximately caused by Defendants' racketeering activity. But for the RICO Defendants' conduct, Plaintiffs would not have incurred the monetary losses described above and expressly incorporated herein by reference.

416.  Plaintiffs' injuries were directly caused by the RICO Defendants' racketeering activities.

417.  Plaintiffs seek actual damages, treble damages, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest.

# COUNT II

## RACKETEER INLUENCED AND CORRUPT ORGANIZATIONS ACT
## 18 U.S.C. 1962(d), *et seq.*
## (All Defendants)

418.  Plaintiffs reallege and incorporate by reference all preceding paragraphs, and allege as follows on behalf of themselves.

419.  Plaintiffs' injuries were proximately caused by Defendants' racketeering activities. But for the RICO Defendants' conduct, Plaintiffs would not have incurred the monetary losses described above and expressly incorporated herein by reference.

420.  Defendants conspired to violate Section 1962(c), as alleged more fully above, by conducting the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity, as incorporated by reference below.

### The Opioid Diversion Enterprise

421. For efficiency and avoiding repetition, for purposes of this claim, Plaintiffs incorporate by reference Paragraphs 311 through 341 concerning the Opioid Diversion Enterprise.

### Conduct of the Opioid Diversion Enterprise

422.  For efficiency and avoiding repetition, for purposes of this claim, Plaintiffs incorporate by reference Paragraphs 342 through 356 concerning the Opioid Diversion Enterprise.

### Pattern of Racketeering Activity

423.  For efficiency and avoiding repetition, for purposes of this claim, Plaintiffs incorporate by reference Paragraphs 357 through 396 concerning the Opioid Diversion Enterprise.

### Damages

424.  The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs' injury in its

businesses, as described above in language expressly incorporated herein by reference.

425.   Plaintiffs bring this claim against all RICO Defendants. At all relevant times, the RICO Defendants were associated with the Opioid Diversion Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, they agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). Under Section 1962(d) it is unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. 18 U.S.C. § 1962(d).

426.   Plaintiffs' injuries were directly caused by the RICO Defendants' racketeering activities.

427.   Plaintiffs seek actual damages, treble damages, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest.

## COUNT III

### UNJUST ENRICHMENT /RECISSION /RESTITUTION
### (All Defendants)

428.   Plaintiffs incorporate paragraphs 1 through 297 within this Count of the Complaint as if they were fully set forth herein.

429.   Defendants are the manufacturer, marketer, seller, distributor, and/or supplier of Defendants' Opioids. Through the wrongful and deceptive conduct described at length above, Defendants have reaped substantial profits from the sale of its Opioids. Yet, Defendants' profits would have been significantly and substantially reduced but for their wrongful, deceptive and unlawful conduct.

430.   Accordingly and as described in this Complaint, Defendants have been unjustly enriched by its unlawful, deceptive and wrongful conduct. Defendants should not be permitted to retain the proceeds from the benefits

conferred upon them by Plaintiffs (i.e., the purchase and/or reimbursement for purchase of Defendants' opioids). Defendants knew that Plaintiffs paid for, or reimbursed the purchases of, Defendants' opioids that were not medically necessary, generally ineffective, and fundamentally unsafe. Moreover, the use of Defendants' opioids in the treatment of chronic pain and/or other long-term medical conditions offered no greater benefits than those offered by less expensive medications and treatment options.

431. It is unjust and inequitable to permit Defendants to enrich themselves at the expense of Plaintiffs by retaining the benefit of the various expenditures for opioid prescriptions that were not medically necessary, effective, or, alternatively, no more efficacious than less expensive, substantially safer medical alternatives, or that were simply the result of Defendants' own self-created demand due to its own deceptive marketing strategies. Accordingly, Defendants must disgorge their unjustly acquired profits and other monetary benefits resulting from their unlawful conduct and provide restitution and/or recession to Plaintiffs.

## COUNT IV

### NEGLIGENCE
### (Manufacturer Defendants)

432. Plaintiffs incorporate paragraphs 1 through 297 within this Count of the Complaint as if they were fully set forth herein.

433. Under State law, to establish actionable negligence, one must show in addition to the existence of a duty, a breach of that duty, and injury resulting proximately therefrom. All such essential elements exist here.

434. Each Manufacturer Defendant had duties to exercise reasonable, or due, care in manufacturing, marketing, and selling, highly dangerous opioid drugs.

435.   Each Manufacturer Defendant breached its aforesaid duties by its conduct previously specified herein.

436.   Each Manufacturer Defendant owed its aforesaid duties to the Plaintiffs because the injuries alleged herein were foreseeable by the Defendants.

437.   Plaintiffs seek compensatory damages for their monetary losses previously specified herein, plus interest and the costs of this action.

## COUNT V

### NEGLIGENCE
### (Distributor Defendants)

438.   Plaintiffs incorporate paragraphs 1 through 297 within this Count of the Complaint as if they were fully set forth herein.

439.   Distributor Defendants have a duty to exercise reasonable care in the distribution of opioids.

440.   Distributor Defendants breached their duty of care by failing to monitor and reduce the distribution of opioids.

441.   Distributor Defendants placed their profit motives above their legal duty and enabled, encouraged and caused the over-prescribing and distribution of opioids.

442.   Distributor Defendants intentionally and/or negligently failed to perform their duty to help to prevent the over-prescription of opioids.

443.   The Plaintiffs are without fault and they would not have paid millions of dollars in inappropriate prescriptions but for the wrongful conduct of the Distributor Defendants.

444.   The Distributor Defendants were a proximate cause of the over-prescription of the opioids and, hence, the millions of dollars in inappropriate prescriptions paid for by Plaintiffs.

## COUNT VI

### WANTONNESS, RECKLESSNESS, AND GROSS NEGLIGENCE
### (Distributor Defendants)

445.   Plaintiffs incorporate paragraphs 1 through 297 within this Count of the Complaint as if they were fully set forth herein.

446.   Defendants' aforesaid acts and omissions were done and omitted knowing that injury to Plaintiffs would likely or probably result; were done or omitted with a reckless or conscious disregard of the rights of Plaintiffs; were done or omitted without the exercise of even a slight degree of care; were done or omitted with conscious indifference to the consequences; and/or constituted a substantial deviation from the standard of care applicable.

447.   As a direct and proximate result of Defendants' wantonness, recklessness, or gross negligence, Plaintiffs were monetarily damaged as aforesaid. Plaintiffs seek compensatory damages, plus the costs of this action.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs ZENITH INSURANCE COMPANY and ZNAT Insurance Company demand Judgment for the following relief:

1. Plaintiffs be awarded compensatory damages in an amount sufficient to fairly and completely compensate Plaintiffs for all damages; all damages as provided by law; treble damages provided by law; civil penalties provided by law; pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

2. Plaintiffs recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

3.  Plaintiffs have such other and further relief as the case may require and the Court may deem just and proper.

October 2nd , 2018                    Respectfully submitted,

ZENITH INSURANCE COMPANY
and ZNAT INSURANCE
COMPANY,

By:___/s/Maura Walsh Ochoa
        Maura Walsh Ochoa, Esq.
        Marc Polansky, Esq.